[Cite as *State v. O.E.P.-T.*, 2023-Ohio-2035.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                   :

      Plaintiff-Appellee,               :               No. 21AP-500
                                        (C.P.C. No. 18CR-5540)

v.                                               :

[O.E.P.-T.],                                     :               (REGULAR CALENDAR)

      Defendant-Appellant.              :

---

D E C I S I O N

Rendered on June 20, 2023

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Prichard,* for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *L. Scott Petroff,* for appellant. **Argued:** *L. Scott Petroff*.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, O.E.P.-T., appeals from the September 7, 2021 judgment of the Franklin County Court of Common Pleas convicting him, pursuant to a jury verdict, of 9 felony sex offenses involving a minor, and sentencing him to 50 years to life imprisonment. For the following reasons, we affirm the trial court's judgment.

## I. PROCEDURAL BACKGROUND

{¶ 2} In November 2018, a Franklin County Grand Jury returned a 13-count indictment charging appellant with 3 counts of rape (2 counts pertaining to a child under 10, 1 count pertaining to a child under 13), 1 count of attempted rape, 6 counts of sexual battery, and 3 counts of unlawful sexual conduct with a minor. (Nov. 8, 2018 Indictment.)

All offenses involved appellant's minor stepdaughter, R.S., within 6 different timeframes between 2012 and 2018.

{¶ 3} Following a 5-day trial, a jury found appellant guilty of Counts 5 through 13 and not guilty of Counts 1 through 4. (Tr. Vol. IV at 635-42.)

{¶ 4} At the September 7, 2021 sentencing hearing, the trial court merged Count 6 with Count 5, Count 8 with Count 7, Count 10 with Count 9, and Count 13 with Count 12. (Sept. 7, 2021 Sent. Tr. at 5-6, 16-19; Sept. 7, 2021 Jgmt. Entry.) In addition to counsel, R.S., R.S.'s mother ("A.C."), and appellant addressed the trial court before the sentence was imposed. After merging the counts, the trial court sentenced appellant as follows:

- **Count 5** – Rape with child under the age of 10 specification, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree: Mandatory 15 years to life imprisonment.

- **Count 7** – Rape with child under the age of 10 specification, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree: Mandatory 15 years to life imprisonment.

- **Count 9** – Rape with child under the age of 13 specification, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree: Mandatory 10 years to life imprisonment.

- **Count 11** – Attempted rape, in violation of R.C. 2923.02(A), a felony of the first degree: Mandatory 5 years to life imprisonment.

- **Count 12** – Sexual battery, in violation of R.C. 2907.03(A)(5), a felony of the third degree: Non-mandatory 5 years imprisonment.

(Sent. Tr. at 16-17; Sept. 7, 2021 Jgmt. Entry.)

{¶ 5} The trial court then made statutory findings relating to the necessity of consecutive prison sentences and ordered appellant to serve the prison sentences consecutively, for an aggregate sentence of 50 years to life imprisonment. (Sent. Tr. at 18.)

{¶ 6} Appellant timely appealed and asserts the following seven assignments of error for our review:

> [I.] THE CUMULATIVE EFFECT OF THE STATE'S FAILURE
> TO PROVIDE CERTAIN DISCOVERABLE EVIDENCE
> RESULTED IN A VIOLATION [OF APPELLANT'S] RIGHT
> TO DUE PROCESS AS REQUIRED BY THE UNITED STATES
> AND OHIO CONSTITUTIONS.

[II.] THE COURT WRONGLY DENIED THE JURY INSTRUCTIONS OFFERED BY [APPELLANT] AND FAILED TO PROPERLY INSTRUCT THE JURY ABOUT UNDISCLOSED EVIDENCE WHEN THAT EVIDENCE WAS IN THE POSSESSION OF STATE AGENTS.

[III.] [APPELLANT] SUFFERED PREJUDICE DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION, BASED UPON THE CUMULATIVE IMPACT OF TRIAL COUNSELS' FAILURE TO OBJECT TO INADMISSIBLE AND PREJUDICIAL OTHER ACTS EVIDENCE, FAILURE TO REQUEST AN OTHER ACTS INSTRUCTION, AND FAILURE TO OBJECT TO THE INTRODUCTION OF THE ENTIRE NATIONWIDE REPORT THAT ESSENTIALLY "DOCTOR WASHED" THE OTHERWISE UNRELIABLE TESTIMONY OF THE ALLEGED VICTIM.

[IV.] THE TRIAL COURT ERRED TO THE PREJUDICE OF [APPELLANT] BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE PRISON TERMS.

[V.] THE TRIAL COURT ERRED TO THE PREJUDICE OF [APPELLANT] BY IMPROPERLY SENTENCING HIM TO THE MAXIMUM AVAILABLE PRISON TERM.

[VI.] THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF [APPELLANT'S] RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION.

[VII.] THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTIONS OF [APPELLANT] IN VIOLATION OF DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION.

## II. FACTUAL OVERVIEW

{¶ 7}  Appellant's jury trial commenced in August 2021, at which time the following facts were established.

{¶ 8} Appellant came into R.S.'s life in 2011 when he met, began dating, moved in with, and married her mother, A.C. (Tr. Vol. II at 217-19, 287-88; Tr. Vol. III at 482-84.) At that time, R.S. (born in 2004) was six or seven years old (Tr. Vol. II at 214, 217-19; Tr. Vol. III at 484) and her biological father had recently left the family's home (Tr. Vol. II at 250). After she turned nine, R.S. stopped seeing or communicating with her biological father. (Tr. Vol. II at 250.) Thereafter, R.S. looked to appellant as the father figure in her life and referred to him as "Dad." (Tr. Vol. II at 217, 256.)

{¶ 9} R.S. testified that appellant began sexually abusing her on a regular basis around 2012/2013 and did not stop until August 2018, when she was 14 years old and reported the abuse to police. (*See* Tr. Vol. II at 214-49.)

{¶ 10} R.S. testified that the "entire reason" for her delayed disclosure was her concern that her two younger sisters—twin girls born to A.C. and appellant in May 2012—would grow up without a father in their lives. (Tr. Vol. II at 249-50, 286-88; Tr. Vol. III at 484.) This concern carried great weight with R.S. because of her own father's absence from her life. (Tr. Vol. II at 249-50, 283.) R.S. also testified that she had a distant relationship with A.C. and older siblings at the time of the abuse, which also contributed to her delayed reporting. (Tr. Vol. II at 249-51, 279-80, 283-85, 321-22, 324; Tr. Vol. III at 359-60.)

{¶ 11} Nonetheless, on August 7, 2018, R.S. reported these incidents to law enforcement. (Tr. Vol. II at 217, 253-54, 262-63, 293; Tr. Vol. III at 364-65.) Although R.S. said she "was afraid that if it continued, [she would] end up dead or something," she did not say she was fearful appellant would harm her. (Tr. Vol. II at 249.) In fact, the record suggests these remarks pertained to R.S.'s reported history of self-harm behaviors and frequent suicidal ideations, including as recently as two days before reporting the abuse to police. (*See, e.g.*, Tr. Vol. III at 393-94; Trial Ex. B at 10-11.)

{¶ 12} In August 2018, R.S.'s sister (age 20), brother (age 17), and twin half-sisters (age 6)—along with a family friend (age 22)—were living in the home with R.S., A.C., and appellant. (Tr. Vol. II at 248, 259-60, 320, 324-25.)

{¶ 13} By 2018, R.S. was already familiar with the investigatory process associated with these types of allegations. This is because, in 2014, R.S. reported to appellant that his son—who had been living with the family since 2012—was sexually abusing her. (Tr. Vol. II at 266-71, 283-84, 288-92; Tr. Vol. III at 490, 509.) These allegations were reported to law

enforcement, investigated, and resulted in criminal convictions. (Tr. Vol. III at 456. *See also* Trial Ex. B at 18.) After she made this disclosure, R.S. began counseling. (Tr. Vol. II at 271-72.) Evidence and testimony presented at trial indicated the timeframe of alleged abuse by appellant (2012-2018) overlapped, in part, with the timeframe of abuse by appellant's son. (*See* Tr. Vol. III at 374, 479.)

### A. R.S.'s allegations against appellant

{¶ 14} At trial, R.S. described sexual conduct that occurred during six distinct time periods over the course of seven years. She explained that she engaged in sexual acts with appellant because of his authoritative role as her stepfather. (*See* Tr. Vol. II at 227, 237-40.) She did what she was told because she believed she did not have a choice. (Tr. Vol. II at 240.) She described capitulating to sexual encounters with appellant because he threatened to take away (or to give back) items that were important to her. (Tr. Vol. II at 227, 237-38.) R.S. testified that if she refused to engage in sexual conduct with him, appellant used "insults or pure force." (Tr. Vol. II at 237-38.)

### 1. June 10, 2012 to June 9, 2013

{¶ 15} The first incident occurred in 2012 at the family's Whitehall residence when R.S. was seven or eight years old. (*See* Tr. Vol. II at 219, 274-75. *See also* Tr. Vol. II at 289-90.) R.S. testified that appellant took her into a closet in his bedroom, directed her to get on her knees and open her mouth, and put his penis inside of her mouth. (Tr. Vol. II at 219-22.) He portrayed the encounter to R.S. as a game. (Tr. Vol. II at 220.) R.S. testified this happened multiple times at the Whitehall residence. (Tr. Vol. II at 220-21.) She also described being told by appellant to swallow when he ejaculated in her mouth. (Tr. Vol. II at 222.) These allegations formed the factual basis for the rape and sexual battery offenses charged in Counts 5 and 6.

### 2. June 10, 2013 to June 9, 2014

{¶ 16} The family moved to "Bar Harbor" in October 2012, when R.S. was eight years old. (*See* Tr. Vol. II at 222-23, 276-77, 290.) R.S. testified that appellant continued making her perform oral sex on him and he began performing oral sex on R.S. in the bed he shared with A.C. (*See* Tr. Vol. II at 222-26.) R.S. also described occasions where appellant asked her to "wake him up [the next morning] by sitting on his face." (Tr. Vol. II at 226-28.) R.S. testified that appellant then pretended she was her mother and called R.S. by her mother's

name. (Tr. Vol. II at 228-29.) According to R.S., these types of sexual encounters happened multiple times at the Bar Harbor home. (Tr. Vol. II at 224-26.) These allegations formed the factual basis for the rape and sexual battery offenses charged in Counts 7 and 8.

### 3. June 10, 2014 to June 9, 2015

{¶ 17} The family moved to the "Chatterly" residence in late 2014, when R.S. was 10 or 11 years old. (*See* Tr. Vol. II at 226, 235, 277-79, 290.) R.S. testified that, at that residence, appellant continued forcing her to perform oral sex on and receive oral sex from him—all of which happened on multiple occasions. (Tr. Vol. II at 226-29, 231-32.) This usually happened in her parents' bedroom. (Tr. Vol. II at 231-32.) These allegations formed the factual basis for the rape and sexual battery offenses charged in Counts 9 and 10.

### 4. May 1, 2014 to October 1, 2015

{¶ 18} R.S. testified that while the family was still living at their Chatterly residence, appellant "attempted to rape [her] multiple times." (Tr. Vol. II at 232-35, 277-79.) She described appellant telling her to bend over the footboard of his marital bed and read a video game booklet while he lubricated and attempted to insert his penis into R.S.'s anus. (Tr. Vol. II at 232-33.) Because R.S. cried, however, he "wouldn't get very far." (Tr. Vol. II at 233.) Although she described this as happening multiple times, R.S. could not recall if appellant ever penetrated her anus with his penis. (Tr. Vol. II at 234.) Again, R.S. was 10 or 11 years old at this time. (Tr. Vol. II at 235.) These allegations formed the factual basis for the attempted rape offense charged in Count 11.

### 5. June 10, 2014 to June 9, 2015

{¶ 19} In October 2015, the family moved from their Chatterly residence to their current residence on Tall Meadows Drive. (Tr. Vol. II at 235, 279-80, 290-91.) R.S. was around 11 years old at this time. (Tr. Vol. II at 235-36.)

{¶ 20} R.S. testified that appellant continued forcing her to perform and receive oral sex, as previously described, at that residence. (Tr. Vol. II at 235-36, 238-42.) During this time, he also began putting his fingers in R.S.'s vagina. (Tr. Vol. II at 236-37.) R.S. described being forced to sit in the same chair with appellant when he was playing video games in the living room so he could "randomly, whenever he felt like it, put his hands into [her] pants * * * and stick his fingers inside" her vagina. (Tr. Vol. II at 236-38.) This happened more

than once. (Tr. Vol. II at 237.) She also testified that appellant groped her breasts, touched her butt, and stuck his head inside her shirt on multiple occasions. (Tr. Vol. II at 238-39.) She testified the sexual encounters occurred in her parents' bedroom, the living room, the hallways, and, essentially, anywhere in the home when no one else was around. (Tr. Vol. II at 239.) These allegations formed the factual basis for the sexual battery and unlawful sexual conduct with a minor offenses charged in Counts 12 and 13.

{¶ 21} R.S. described the layout of the Tall Meadows home (Tr. Vol. II at 239-42), and the state presented ten photographs of the home as evidence at trial. (Tr. Vol. II at 242-46; Trial Ex. A-1 through A-10; Tr. Vol. III at 436. *See also* Tr. Vol. III at 503-08.)

### 6. August 6, 2018

{¶ 22} R.S. also testified that appellant sexually abused her on two separate occasions in 2018 at their Tall Meadows residence. (Tr. Vol. II at 245-49.) Testifying about one incident, R.S. claimed that after repeatedly calling and texting her, appellant came into her bedroom, joined her in bed, kissed her, and touched her vagina and breasts underneath her clothing. (Tr. Vol. II at 246-47.) R.S. described appellant putting his hands down her pants and inserting his fingers into her vagina approximately one week later. (Tr. Vol. II at 247-49.) He then told R.S. to come downstairs to his bed, and he performed cunnilingus on her. (Tr. Vol. II at 248.) These allegations formed the factual basis for the sexual battery and unlawful sexual conduct with a minor offenses charged in Counts 1 through 4.

### B. Investigation and Deactivation of Case–August/September 2018

{¶ 23} On August 7, 2018, Columbus Police Department ("CPD") Officer Joel Huffman was on patrol when he was dispatched to the Tall Meadows address in response to a sexual abuse call made by R.S. to police. (Tr. Vol. I at 199-202.) Based on the information R.S. gave to law enforcement, appellant was taken into custody that day. (Tr. Vol. I at 203; Tr. Vol. III at 496-97.)

{¶ 24} Although R.S.'s older sister, A.C., and the family friend residing in the home were present while officers were there, Officer Huffman testified he did not interview or take statements from anyone else at the scene. (Tr. Vol. I at 202, 205.) Nor did he collect any evidence. (Tr. Vol. I at 205.) Instead, he referred the matter to Detective Jennifer Haas, who was then assigned as the lead investigator on this case. (*See* Tr. Vol. I at 203-04; Tr. Vol. III at 444-45.)

{¶ 25} After appellant was taken into custody, he voluntarily signed a waiver of his *Miranda* rights and consented to an interview with Detective Haas at CPD headquarters. (Tr. Vol. III at 444-45, 449-51, 497-98.) While he was being interviewed, R.S. was undergoing a forensic interview at Nationwide Children's Hospital Child Assessment Center ("CAC") with Alicia Daniels, a licensed independent social worker. (Tr. Vol. III at 445-46, 448-49. *See also* Tr. Vol. III at 358-59; Trial Ex. B.) A copy of Ms. Daniels's report created in connection with that interview was presented and admitted—in its entirety and without any redactions—without objection at trial. (Trial Ex. B; Tr. Vol. III at 360-61, 436.)

{¶ 26} In her August 7, 2018 interview with Ms. Daniels, R.S. disclosed chronic sexual abuse by appellant starting when she was eight years old. (Tr. Vol. III at 361-64.) Detective Haas's partner, Detective Jones, observed R.S.'s forensic interview and conveyed the information R.S. shared to Detective Haas while she was interviewing appellant. (Tr. Vol. III at 449-52.) During the interview, Detective Haas shared R.S.'s allegations with appellant. (Tr. Vol. III at 451.) Appellant told Detective Haas R.S.'s allegations against him were similar to the allegations R.S. made against his son in 2014. (Tr. Vol. III at 456, 498.)

{¶ 27} Also on August 7, 2018, Dr. Farah Brink performed a physical examination and collected evidence from R.S. at Nationwide CAC. (Tr. Vol. III at 387-89, 394-96; Tr. Vol. II at 264-66.) R.S. reported to Dr. Brink and Ms. Daniels that appellant penetrated her vagina with his fingers and put his mouth on her vagina and both breasts the day before. (Tr. Vol. III at 361-62, 399-400; Trial Ex. B; Trial Ex. C-5. *See also* Tr. Vol. II at 265-66.) Dr. Brink testified that her physical examination of R.S. was unremarkable (other than well-healed scars on her thighs that R.S. reported were from incidents of self-harm) and that she observed no signs of sexual abuse related trauma. (Tr. Vol. III at 394-95, 402-03, 411-12, 416-18.) Because R.S. alleged sexual assault occurred within 72 hours of her arrival at Nationwide CAC, Dr. Brink also collected DNA evidence from R.S. for the sexual assault nurse examination ("SANE") kit (e.g., rape kit or forensic kit). (Tr. Vol. III at 386, 396-99, 406-07, 457-58; Trial Ex. C-5.) In Dr. Brink's corresponding records, she indicated that R.S. told her she had bathed, brushed her teeth, urinated, had a bowel movement, changed clothes, eaten, and consumed beverages since her assault the previous day. (Tr. Vol. III 400-01, 415; Trial Ex. C-5.)

{¶ 28} On August 7, 2018, while he was in custody, appellant voluntarily provided a DNA sample to law enforcement upon Detective Haas's request. (Tr. Vol. III at 453, 498-99.) Thereafter, five samples from the SANE kit performed on R.S. were submitted to CPD's crime lab for comparison with appellant's DNA sample: vaginal swabs, anal swabs, thigh swabs, breast swabs, and tissue paper.[1] (Tr. Vol. III at 424-32, 457-58, 461-62; Trial Ex. D. *See also* Tr. Vol. III at 424-25.) Ultimately, the CPD crime lab issued a report (dated August 22, 2018) containing the results of its SANE kit analysis: no male DNA was detected on any of the five samples. (Tr. Vol. III at 425-30, 432-34, 458-59, 461-62; Trial Ex. D.)

{¶ 29} Detective Haas also learned from R.S.'s forensic interview that R.S. claimed appellant had sexually explicit videos or photographs on his phone. (Tr. Vol. III at 453-55. *See also* Tr. Vol. II at 268-69; Tr. Vol. III at 363.) Detective Haas thus asked appellant for consent to search his cellphone, and appellant voluntarily signed a release for his cellphone to be seized and searched by police. (Tr. Vol. III at 446, 454-55, 499.) Subsequently, Detective Haas submitted the phone to CPD's digital forensic unit for data extraction and analysis. (Tr. Vol. III at 455.) Ultimately, the forensic examination of his phone produced nothing of evidentiary value in this case. (Tr. Vol. III at 455-56, 460.)

{¶ 30} On August 14, 2018, Detective Haas conducted a follow-up interview with R.S. and asked for the clothes she had worn during the August 6, 2018 incident. (Tr. Vol. III at 458-59.) R.S. was unable to turn over the clothes, however, because she had since washed them. (Tr. Vol. III at 458-59; Tr. Vol. II at 267-68.)

{¶ 31} During her investigation, Detective Haas spoke with A.C. several times over the phone. (Tr. Vol. III at 447-48, 460-64, 471; Tr. Vol. II at 332-33.) At trial, A.C. testified that during an August phone conversation, Detective Haas told her to record conversations she had with appellant. (Tr. Vol. II at 294, 303, 334.) In her testimony, Detective Haas asserted that although she did not recall affirmatively telling A.C. to do this, "it would not be unusual" for her to endorse a witness's offer to try to obtain recorded admissions from a

---

[1] The tissue paper came from R.S.'s attempt at collecting DNA evidence after appellant performed cunnilingus on her the day before. (Tr. Vol. II at 252-53, 266; Tr. Vol. III at 365, 375, 399, 428.) R.S. also gave one of the Nationwide CAC doctors a pubic hair she found on her hand after she touched appellant's penis. (*See* Tr. Vol. II at 253, 266-68, 281-82; Tr. Vol. III at 365, 375, 457, 475-76.) R.S. explained she collected this evidence because, prior to calling police, she "had done a small amount of research." (Tr. Vol. II at 252-53. *See also* Tr. Vol. II at 267-68, 281-82.)

suspect in a case such as this one. (Tr. Vol. III at 466-67.) Nothing in the record suggests, however, that Detective Haas or anyone from CPD gave A.C. instructions, recording equipment, or specific questions to ask appellant.

{¶ 32} On September 13, 2018, Detective Haas told A.C. that nothing of evidentiary value was recovered from appellant's cellphone or the SANE kit. (Tr. Vol. III at 460-63; Tr. Vol. II at 333-34). In response, A.C. advised Detective Haas that she and R.S. no longer wanted the case to proceed. (Tr. Vol. III at 460-64, 470-71. *See also* Tr. Vol. II at 335, 339-40.) A.C. also expressed to Detective Haas doubts she had about the veracity of R.S.'s allegations against appellant. (Tr. Vol. III at 463; Tr. Vol. II at 335, 340.) Detective Haas closed (or inactivated) her investigation into appellant on September 19, 2018. (Tr. Vol. III at 463-66.)

{¶ 33} Nonetheless, even after CPD ceased its investigation, A.C. continued recording her conversations with appellant. (Tr. Vol. II at 335-40.)

## C. Recorded Conversations and Reactivation of Case–October 2018

{¶ 34} A.C. began recording her conversations with appellant shortly after he was released from jail. (*See* Tr. Vol. II at 326-27, 334-35; Tr. Vol. III at 500-02.) She testified at trial about recording "probably 100" of her conversations with appellant between mid-August and late October 2018. (Tr. Vol. II at 303, 334, 337. *See also* Tr. Vol. II at 295-96, 335-36, 339-40.) She testified these recorded conversations took place at various locations, but all six recordings played at trial occurred in a car. (*See* Tr. Vol. II at 294-95, 304, 309, 312-15; Tr. Vol. III at 500-03.) A.C. never told appellant that he was being recorded. (Tr. Vol. II at 336.) Although appellant testified that he "kind of thought she was," A.C. denied that she was recording him whenever he asked. (Tr. Vol. III at 517-18.)

{¶ 35} In late October 2018, A.C. turned over at least six recordings of her conversations with appellant to CPD Detective McGuire. (Tr. Vol. III at 472-73. *See also* Tr. Vol. II at 337-38, 340-41.) Detective McGuire informed Detective Haas that A.C. had been in contact with him about the case. (*See* Tr. Vol. III at 466, 472-73; Tr. Vol. II at 340.) But, because Detective Haas was out on vacation, she did not actively pursue any further investigation. (Tr. Vol. III at 466. *See also* Tr. Vol. II at 332-33.) Accordingly, Detective McGuire reviewed the recordings. (*See* Tr. Vol. III at 472-74.)

{¶ 36} Soon thereafter, police reactivated their investigation. (*See* Tr. Vol. II at 296; Tr. Vol. III at 472-74.) Appellant was rearrested in late October 2018 and indicted with 13 felony sex offenses on November 8, 2018. (*See* Tr. Vol. II at 296, 327.)

{¶ 37} Six recorded conversations between appellant and A.C. were played for the jury in their entirety and admitted as evidence at trial over the defense's objection. (Tr. Vol. III at 437-40. *See, e.g.*, Tr. Vol. II at 303-16.)

### 1.  First Recording

{¶ 38} In the first recording (Trial Ex. E-1; Tr. Vol. II at 304-06), A.C. asked appellant: "But how do I know you're not going to do this stuff again?" (Trial Ex. E-1 at 3:50.) At trial, A.C. testified she was referring to the sexual abuse of R.S. (Tr. Vol. II at 305.) Appellant responded: "I'm not. That's the thing, I'm not. You know, you don't understand. You know what a wake-up call is?" (Trial Ex. E-1 at 3:54.) When A.C. talked about her difficulty in coming to terms with the reality of the situation, appellant told her: "There is nothing to deal with. That's what I'm trying to tell you." (Trial Ex. E-1 at 7:25.)

{¶ 39} A.C. expressed concerns about R.S.'s behavior on multiple occasions during that recorded conversation; each time, appellant said R.S. is smart and manipulative. (Trial Ex. E-1 at 8:12, 12:15.) A.C. asked: "So, basically, it's not as traumatic as she made it out to be, right?," to which appellant responded: "No, it's not." (Trial Ex. E-1 at 9:55; Tr. Vol. II at 305-06.) He also told A.C. that half of R.S.'s allegations were untrue. (Trial Ex. E-1 at 10:05.)

{¶ 40} During the recorded conversation, appellant denied the sexual abuse started as early as R.S. reported. When A.C. asked when it started, appellant indicated he needed to think. (Trial Ex. E-1 at 11:10.) Appellant also denied abusing R.S. before she made the allegations about his son in 2014, but when A.C. suggested "it was after," appellant responded by accusing her of fishing. (Trial Ex. E-1 at 12:00.) He expressed frustration that A.C. repeatedly asked questions he had already answered. (Trial Ex. E-1 at 12:15.) Appellant never unequivocally denied all of the allegations.

### 2.  Second Recording

{¶ 41} In the second recorded conversation (Trial Ex. E-2; Tr. Vol. II at 306-09), appellant said: "I hope you paid attention when I told you that [R.S.] is smarter than what you think." (Trial Ex. E-2 at 5:04.) A.C. agreed that R.S. is above-average, figures things out, and knows how to manipulate people. (Trial Ex. E-2 at 5:10.)

{¶ 42} A.C. brought up an incident when she saw R.S.'s arm around appellant and shared her general concern that appellant was in a relationship with R.S. (*See* Trial Ex. E-2 at 5:40.) Appellant asserted R.S. "is not as innocent as you think," implying R.S. initiated some of their alleged sexual encounters, and emphasized that he did not make R.S. do anything. (Trial Ex. E-2 at 7:43, 9:40; Tr. Vol. II at 307-08.) Appellant acknowledged the harm he had caused and was "trying to make it up to everybody [he] hurt." (Trial Ex. E-2 at 8:55.) A.C. suggested that R.S. was "experimenting with [appellant's] crazy sexuality," and appellant responded that he was protecting R.S. by not telling A.C. about R.S.'s behavior towards him. (*See* Trial Ex. E-2 at 10:30.) He also claimed he caught R.S. staring at his penis when he was wearing boxers, but acknowledged he "should have known better." (Trial Ex. E-2 at 11:50.) Appellant denied knowing "how this began." (Trial Ex. E-2 at 11:39.)

{¶ 43} When appellant expressed concern that A.C. might tell someone about these admissions, she responded: "No, I'm not. I can't! * * *, if I say anything, can you imagine, if I know that this happened, and she tells somebody that I know, you know what's going to happen? They're going to yank my twins." (Trial. Ex. E-2 at 11:19.)

{¶ 44} Also during the recorded conversation, A.C. asked if R.S. is still a virgin, and appellant denied having sexual intercourse with her. (Trial Ex. E-2 at 13:00.) A.C. then clarified: "So, it was basically just like mutual oral," to which appellant responded: "Yeah, yeah. Something like that." (Trial Ex. E-2 at 13:25; Tr. Vol. II at 308.)

### 3.  Third Recording

{¶ 45} In the third recording (Trial Ex. E-3; Tr. Vol. II at 309-12), A.C. and appellant contemplated their long-term situation since A.C.'s children (including R.S.) no longer wanted to be in the home with appellant. (Trial Ex. E-3 at 10:30; Tr. Vol. II at 309-10.) Appellant reiterated that R.S. is not an innocent party. (*See* Trial Ex. E-3 at 20:25.) He conceded that he "know[s] it was wrong," but maintained some things R.S. said about him were untrue. (*See* Trial Ex. E-3 at 21:35.)

{¶ 46} A.C. told appellant that R.S. said he would "wake her up to do it," which appellant repeatedly denied. (Trial Ex. E-3 at 16:00.) Appellant also denied "this" occurred on a daily basis. (Trial Ex. E-3 at 25:05.) After A.C. said R.S. claimed it was a few times a week, appellant responded: "No, not even." (Trial Ex. E-3 at 25:30.) He denied it happened often and told A.C.: "I can't tell you exactly how it is, but I can tell you, no, it wasn't a few

times a week." (Trial Ex. E-3 at 26:15.) When A.C. asked appellant to tell her how it started, he responded: "I'm trying to think." (Trial Ex. E-3 at 26:20.) He ultimately suggested it began when he and A.C. "were arguing a lot." (Trial Ex. E-3 at 27:55.) A.C. asked if it began at "this house" (meaning the Tall Meadows residence), but appellant responded: "No, I believe it was Chatterly." (Trial Ex. E-3 at 27:58; Tr. Vol. II at 311.)

### 4. Fourth Recording

{¶ 47} In the fourth recorded conversation between appellant and A.C. (Trial Ex. E-4; Tr. Vol. II at 312-13), appellant again denied ever going into R.S.'s room to engage in sexual conduct with her. (Trial Ex. E-4 at 10:00.) A.C. referenced their earlier conversation about when the conduct started, and appellant did not deny what he previously shared. (Trial Ex. E-4 at 10:30.) When A.C. asked what triggered the conduct, appellant became irritated and responded: "I told you when, I told you about what time. Okay? And where. * * * I just told you, we were fighting a lot." (Trial Ex. E-4 at 13:05, 17:10.) He also told A.C. the first time "it happened" was in their downstairs living room. (Trial Ex. E-4 at 14:30.)

### 5. Fifth Recording

{¶ 48} In the fifth recording (Trial Ex. E-5; Tr. Vol. II at 313-15), appellant assured A.C. "it won't" happen again. (Trial Ex. E-5 at 10:50; Tr. Vol. II at 314.) He also denied "ever doing anything like that before." (Trial Ex. E-5 at 11:31; Tr. Vol. II at 314-15.) Appellant told A.C. he inflicted some harm on his arms because he was ashamed. (Trial Ex. E-5 at 16:00.)

{¶ 49} A.C. suggested she might be at fault for what happened, and appellant responded: "It was all me. I knew right from wrong." (Trial Ex. E-5 at 11:40; Tr. Vol. II at 315.) A.C. expressed concern about the long-term "horrific effect" sexual abuse might have on R.S., and appellant told A.C. to just keep doing what she's doing. (Trial Ex. E-5 at 12:30.) A.C. mentioned R.S. saying she was forced, to which appellant did not respond. (Trial Ex. E-5 at 13:40.)

### 6. Sixth Recording

{¶ 50} In the sixth recorded conversation played for the jury (Trial Ex. E-6; Tr. Vol. II at 315-17), A.C. emphasized the gravity of the situation to appellant. (Trial Ex. E-6 at 13:40.) In response, appellant said: "[Y]ou act like I don't understand it, or I don't feel it, or I'm not guil...like I don't feel...like I don't feel anything about it." (Trial Ex. E-6 at 13:50.)

Appellant told A.C. he is "trying to show [her] that [he] want[s] to deal with it" and that he "can be better." (Trial Ex. E-6 at 24:34. *See also id.* at 15:25.)

{¶ 51} A.C. told appellant she wanted a new bed as a result of his previous confirmation that "it" happened in their bedroom. (Trial Ex. E-6 at 17:10, 17:23.) Appellant responded: "That's fine." (Trial Ex. E-6 at 17:20.) A.C. explained that "in order to forget things," she had "to get rid of everything that reminds [her] of it." (Trial Ex. E-6 at 17:55.) Appellant told her they would buy a new mattress that weekend. (Trial Ex. E-6 at 18:00.)

{¶ 52} A.C. expressed concern about getting counseling "for this and not tell[ing] everything." (Trial Ex. E-6 at 20:19.) She said: "I've kissed your lips, and I know where they've been, and that bothers me." (Trial Ex. E-6 at 20:30.) Appellant's suggested solution was for A.C. not to kiss him anymore. (Trial Ex. E-6 at 20:33.) Appellant assured A.C. that "it wasn't as bad as [R.S.] said," but A.C. said she "didn't want to imagine [her] husband going down on [her] daughter." (Trial Ex. E-6 at 20:45.) Appellant did not deny or otherwise expressly address this statement.

{¶ 53} Appellant expressed regret about telling A.C. the truth because she was not handling that information well. But, he ultimately concluded that: "If I kept it, I knew we couldn't heal. * * * But don't call me selfish when all I did was think about you, to sit there and tell you that, man." (Trial Ex. E-6 at 23:10.)

### 7. Possible Additional Recordings Not Produced or Provided

{¶ 54} During trial, A.C. testified that she turned over more than six recordings to CPD, and speculated there may have been at least two more. (Tr. Vol. II at 337-38.) Detective Haas testified she had no knowledge of the number or content of the recorded conversations A.C. gave to CPD because Detective McGuire received and reviewed the recordings and took over that part of the case. (Tr. Vol. III at 472-74.) A.C. explained that she only met Detective McGuire once and R.S. "did most of the communication with him." (*See* Tr. Vol. II at 340.) Although he was under subpoena (May 28, 2021 Subpoena), neither party called Detective McGuire to testify at trial.

{¶ 55} The state and defense counsel both indicated they were surprised by A.C.'s mid-trial revelation about the existence of more than six recorded conversations with appellant. (*See* Tr. Vol. II at 337-38; Tr. Vol. III at 438.) A.C. testified that some of the recordings were lost when her phone malfunctioned, but she did not indicate how many.

(Tr. Vol. II at 296, 337-38.) She also seemed to suggest that recordings she did not believe were "usable" were not preserved or turned over to police. (*See* Tr. Vol. II at 296.) However, neither the state nor defense counsel asked A.C. to clarify what she meant by "usable" or how many of her recorded conversations she believed were not "usable," and therefore, not preserved.

{¶ 56} Appellant testified that he repeatedly denied R.S.'s allegations during conversations with A.C., which he suggested would be on other recordings not provided or preserved. (*See* Tr. Vol. III at 517-19.) He claimed the conversations in the six recordings played for the jury occurred in late October 2018, after A.C. had been "hammering [him] about these things" for weeks and shortly after his brother died. (Tr. Vol. III at 517-19, 528-29.) Appellant also claimed he made the inculpatory statements (admissions and failures to deny) on those six recordings in an attempt to stop A.C.'s repeated questioning. (Tr. Vol. III at 518-21.) Appellant further alleged he made these inculpatory statements on one occasion after A.C. threatened to harm herself. (Tr. Vol. III at 518-21.) This threat is not reflected in any of the six recordings played at trial, however, and A.C. was never questioned about this claim.

### D. Other Evidence and Testimony Presented at Trial

{¶ 57} During trial, R.S. described appellant's penis as uncircumcised and stated there is a mole "somewhere around his penis." (Tr. Vol. II at 253.) A.C. testified that appellant was uncircumcised, had "a mark down there," and had "some scarring on the head" of his penis. (Tr. Vol. II at 317.)

{¶ 58} Appellant testified at trial and expressly denied all of the allegations. (Tr. Vol. III at 522-23.) During trial, appellant's counsel relied on R.S.'s 2014 experience with reporting sexual abuse to undermine R.S.'s credibility in three ways. *First*, to emphasize R.S.'s delayed disclosure of sexual abuse by appellant despite being in a position to tell an adult outside of her home when she raised the sexual abuse allegations in 2014. (*See, e.g.*, Tr. Vol. II at 269-74, 322-24; Tr. Vol. III at 494-96.) *Second*, to suggest R.S. conflated abuse by appellant's son with the allegations she was making against appellant. (*See, e.g.*, Tr. Vol. II at 269-80; Tr. Vol. III at 373-74, 498, 509, 513-15.) And *third*, to argue the allegations were fabricated by R.S. who, the defense contended, was smart, manipulative, familiar with

law enforcement investigations, and knew what she needed to say to ensure appellant would be removed from her home. (*See, e.g.*, Tr. Vol. II at 258, 267-68, 322.)

## III. ANALYSIS

{¶ 59} On appeal, appellant raises seven assignments of error. We address all assignments of error in the order in which they are raised except for the third assignment of error arguing ineffective assistance of trial counsel, which we address last.

### A. First Assignment of Error

{¶ 60} In his first assignment of error, appellant argues the state suppressed evidence—recordings of conversations between A.C. and appellant—in violation of his constitutional right to due process and *Brady v. Maryland*, 373 U.S. 83 (1963). (Appellant's Brief at 14-19.) He explains why he believes additional recordings were withheld, destroyed, or lost and suggests the trial court erred in admitting the six recordings over defense counsel's objection under *Brady*.

#### 1. Controlling Law

{¶ 61} The crux of appellant's arguments begins with *Brady*, wherein the Supreme Court of the United States held that due process requires the prosecution to provide to the defense any evidence favorable to the accused that is material either to guilt or punishment. 373 U.S. at 83, 87-88. *See also Smith v. Cain*, 565 U.S. 73, 75 (2012) (a criminal defendant's due process rights are violated when the state "withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment"). The Supreme Court subsequently held that such obligation includes evidence affecting the credibility of a prosecution witness, including impeachment evidence. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). A *Brady* violation occurs when: (1) the state suppresses evidence, either willfully or inadvertently; (2) the evidence is favorable to the defendant as either exculpatory (material) or impeachment evidence; and (3) prejudice has resulted to the defendant. *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, ¶ 19, citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice occurs when there is a reasonable probability that the result of the trial would have been different had the evidence been disclosed to the defense. *Id.*, citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995), quoting *United States v. Bagley*, 473 U.S. 667, 678, 682 (1985).

{¶ 62} If a defendant cannot demonstrate that undisclosed or lost evidence is materially exculpatory, then, to establish a due process violation, the defendant must demonstrate the police or prosecution lost, destroyed, or failed to preserve the "potentially useful" evidence in bad faith. *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, ¶ 10; *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). "The term 'bad faith' generally implies something more than bad judgment or negligence." (Citations omitted.) *State ex rel. Horton v. Kilbane*, 167 Ohio St.3d 413, 2022-Ohio-205, ¶ 31. It "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive[,] or ill will partaking of the nature of fraud." (Citations omitted.) *Id. See also State v. Wolf*, 154 Ohio App.3d 293, 2003-Ohio-4885, ¶ 14 (7th Dist.), quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983). A continuing cavalier attitude toward preservation of evidence with an abundantly apparent evidentiary value can, under certain facts and circumstances, amount to "bad faith." *See, e.g.*, *State v. Durnwald*, 163 Ohio App.3d 361, 2005-Ohio-4867, ¶ 31-36 (6th Dist.); *State v. Benson*, 152 Ohio App.3d 495, 2003-Ohio-1944, ¶ 14-15 (1st Dist.).

## 2. Trial court proceedings related to potentially missing recordings

{¶ 63} Although trial counsel knew about the six recorded conversations before trial began, neither the prosecutor nor appellant's defense counsel knew A.C. would testify she recorded these conversations at the request of law enforcement. (*See, e.g.*, Tr. Vol. II at 299; Tr. Vol. III at 438.) After A.C. testified that Detective Haas asked her to record her conversations with appellant, appellant's trial counsel moved for either a continuance or a mistrial pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (Tr. Vol. II at 299-302.) These oral motions were predicated on the argument that such statements were unconstitutionally obtained by a third-party actor on behalf of the state because "[n]o *Miranda* rights were given when these statements were elicited from [appellant]." (Tr. Vol. II at 300.) Had such information been known prior to trial, appellant's counsel argued, the defense would have moved to suppress the recordings before trial commenced. (Tr. Vol. II at 300.) In denying those motions, the trial court noted that nothing in the record suggested appellant's statements to A.C. were obtained while he was "in custody," which is necessary for purposes of *Miranda*. (Tr. Vol. II at 301.) *See, e.g.*, *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶ 9-24. Appellant does not challenge that ruling on appeal.

{¶ 64} After the six recorded conversations were played at trial (without objection), A.C. testified on cross-examination that, between August and October 2018, she recorded "probably 100" conversations with appellant. (Tr. Vol. II at 335-37. *See also* Tr. Vol. II at 295-96.) Some of those recordings were lost when her phone malfunctioned, while others (beyond the six played at trial) may have been deleted by her, not turned over to police, or provided to police but not produced in discovery to appellant's counsel. (*See* Tr. Vol. II at 337-38; Appellant's Brief at 14-19. *See also* Tr. Vol. II at 296.) The record shows that the prosecutor and appellant's counsel were surprised by A.C.'s mid-trial revelation about the possible existence of more than six recordings, including potentially two more recordings she gave to law enforcement. (*See* Tr. Vol. II at 337-38; Tr. Vol. III at 438.) Yet, appellant's trial counsel did not move the trial court for any remedial action—mistrial, continuance, exclusion of evidence, or otherwise—based on Crim.R. 16 or *Brady* at that time.

{¶ 65} When the state moved to admit the six recordings as evidence the day after A.C. testified, appellant's trial counsel objected, citing *Brady*. (*See* Tr. Vol. II at 437-38.) In response, the prosecutor represented that he had not been made aware of any other possible recordings until A.C. testified at trial. (Tr. Vol. III at 438.) Appellant's counsel did not refute this representation; instead, he requested a jury instruction concerning missing evidence, which is the subject of appellant's second assignment of error. (Tr. Vol. II at 438.)

{¶ 66} The trial court ultimately admitted the six recordings over the defense's objection, but suggested that if the defense "end[ed] up calling the detective or anything like that, that [issue relating to potentially withheld or destroyed evidence] could be explored as well." (Tr. Vol. II at 438-39.)

{¶ 67} During the defense's case-in-chief, appellant's trial counsel called Detective Haas as a witness. Detective Haas testified that Detective McGuire handled this portion of the investigation and she did not review or receive A.C.'s recordings. (Tr. Vol. III at 473-74.) And although Detective McGuire was subpoenaed for trial (May 28, 2021 Subpoena), neither the state nor defense counsel elected to call him as a witness.

### 3. Analysis

{¶ 68} Appellant argues in his first assignment of error that additional recordings of conversations he had with A.C. existed (at least at some point) and would have supported

his testimony and weakened the inculpatory value of the six recordings played for the jury and admitted into evidence at trial.

{¶ 69} Appellant and A.C. both testified about having many in-person conversations after R.S. reported sexual abuse to police. (*See*, *e.g.*, Tr. Vol. III at 500-03, 528; Tr. Vol. II at 293-96.) Appellant testified that he repeatedly denied R.S.'s allegations during these conversations. (Tr. Vol. III at 517-22, 528-29, 534-36.) The recordings played for the jury did not, however, include adamant or unequivocal denials by appellant.

{¶ 70} During his testimony, Appellant claimed the recordings played for the jury depicted conversations that took place after A.C. had "been hammering" him for months about R.S.'s allegations and suggested what he said in those recordings was what he believed was necessary for "her to stop." (Tr. Vol. III at 518-19, 528-29.) Appellant described A.C. questioning him about R.S.'s allegations while threatening to harm herself with a razor on one occasion. (Tr. Vol. III at 520-21.) But that conversation was not among the six played at trial, and it is unclear precisely what impact he purports that interaction had on any subsequent conversations. (*See* Tr. Vol. III at 520-21.) Appellant also proffered in his trial testimony that, when the inculpatory recordings were made, he was in a bad mindset and was desperate to see his children (which A.C. facilitated, on some occasions when they met). (Tr. Vol. III at 518, 520-22, 532-36.) At trial, appellant expressly denied engaging in any sexual acts with R.S., and speculated that his repeated denials of the allegations during conversations with A.C. would be reflected on the other possible recordings A.C. may have made. (Tr. Vol. III at 517-21, 522-23, 534-36.)

{¶ 71} Appellant's *Brady* claim fails, however, at its inception. Although he speculates about the nature of the conversations that would have been on other potential recordings that may have, at some point, existed, it is well-established that mere speculation—without more—is insufficient to support a claimed *Brady* violation. *See*, *e.g.*, *State v. Sullivan*, 10th Dist. No. 13AP-861, 2014-Ohio-1260, ¶ 20, citing *State v. Moore*, 10th Dist. No. 11AP-1116, 2013-Ohio-3365, ¶ 43, and *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 60. Everything appellant claims on appeal about possible recordings of conversations he had with A.C.—from the number, content, and whether the state knew (or should have known) about them—is based on speculation.

{¶ 72} A.C. testified she was not sure how many conversations she recorded, but conjectured "probably 100." (Tr. Vol. II at 337.) Some of those recordings, she testified, were lost because her "one phone burnt up after a few months of recording." (Tr. Vol. II at 296.) Nothing in the record indicates, however, precisely (or even approximately) how many recordings were lost as a result. If anything, the record suggests most of A.C.'s recordings were lost due to the malfunctioning of her phone. (*See* Tr. Vol. II at 337-38.)

{¶ 73} Appellant contends in his brief that "[A.C.] claims she provided at least two additional recordings to detectives." (Appellant's Brief at 17.) But that claim is itself a speculative extrapolation of her actual testimony, which is set forth, in relevant part, below:

> [DEFENSE:] And of those 100 -- or hundreds of recordings, you turned over six to the Columbus police, correct?
>
> [A.C.:] Actually, no, there are more. Like, there were more. I'm not sure why there's only six here.
>
> * * *
>
> [DEFENSE:] How many more were not turned over?
>
> [A.C.:] There's probably two more that weren't. Well, they should have been turned over. I don't know why they weren't.

(Tr. Vol. II at 337.) Based on this testimony, it is not entirely clear whether A.C. meant there were two additional recordings in her possession that she did not turn over to police or that she gave two additional recordings to police that were not played by the state at trial. The defense did not attempt to clarify her testimony, and Detective Haas was not able to offer additional information because Detective McGuire took A.C.'s call and dealt with the recordings. (Tr. Vol. III at 473-74. *See also* Tr. Vol. II at 332, 340.)

{¶ 74} Moreover, Detective McGuire was not called to testify at trial. Thus, there is no testimony in the record from the detective who received and reviewed the recordings about the number and content of the recordings that appellant now argues on appeal were unconstitutionally withheld. And, of note, A.C. was not asked to describe the conversations she recorded but, for whatever reason, were not played at trial.

{¶ 75} Without some evidence beyond appellant's hypotheses—that additional recordings actually existed and contained material exculpatory evidence—appellant cannot

prove the state violated *Brady*. As such, we find appellant failed to prove the recordings at issue would have provided material exculpatory evidence.

{¶ 76} Because the content of the possible additional recordings is unknown and only potentially useful, appellant must establish bad faith on the state's part to succeed with a due process claim. *See Geeslin*, 2007-Ohio-5239 at ¶ 10; *Youngblood*, 488 U.S. at 57-58. The evidence appellant argues was unconstitutionally suppressed falls into three categories: (1) recordings in the possession of law enforcement that were not given to the defense; (2) recordings lost due to the malfunction of A.C.'s phone; and (3) recordings A.C. may have intentionally deleted.

{¶ 77} As to the first category, we reiterate that, as described above, appellant has not provided compelling proof that any of these recordings existed or were available to the state. It is true that the *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor.' " *Strickler*, 527 U.S. at 280-81, quoting *Kyles*, 514 U.S. at 438. And, "[i]n order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf * * *, including the police.' " *Id.*, quoting *Kyles* at 437. But the record does not clearly establish that any additional recordings were, in fact, provided to law enforcement. Further, without evidentiary support or any legal argument, appellant contends that we should somehow infer bad faith by either the police or the prosecutor. We decline to speculate about malfeasance by the state when the defense did not adequately attempt to develop the record below by, for instance, calling Detective McGuire as a witness or attempting to clarify A.C.s testimony on this matter. Accordingly, the arguments appellant makes with respect to this first category of suppressed evidence are not well-taken.

{¶ 78} As to the second and third categories of suppressed evidence—lost or deleted recordings—appellant does not point to any authority for the proposition that *Brady* requires the state to secure and ensure the preservation of evidence not in its possession from third parties. We recognize A.C. claimed Detective Haas asked her to start recording her conversations with appellant. (*See, e.g.*, Tr. Vol. II at 294, 327, 334.) And while Detective Haas had no recollection of telling A.C. to do this, it is true that Detective Haas acknowledged "it would not be unusual" for her to endorse a witness's offer to try to obtain

recorded admissions from a suspect in a case such as this one. (Tr. Vol. III at 466-67.) But we do not find this evidence sufficiently establishes that A.C. was acting on behalf of the state when she recorded her conversations with appellant.

{¶ 79}  Because this case involves the potential disposal of evidence by a third-party who was not acting on behalf of or at the direction of the state, it is difficult for appellant to connect the destruction of evidence to bad faith on the part of the state. Nothing in the record suggests the state was even aware of the recordings lost on A.C.'s phone or that A.C. may have deleted. "Without state action, the panoply of constitutional protections generally does not apply." *State v. Fornshell*, 1st Dist. No. C-180267, 2021-Ohio-674, ¶ 11, citing *Bouquett v. St. Elizabeth Corp.*, 43 Ohio St.3d 50, 53 (1989) (appellee required to show state action to "warrant the constitutional protection of due process").

{¶ 80} Our determination that A.C. was not a state actor is fatal to appellant's arguments concerning lost or destroyed evidence. But, even if she were a state actor, his arguments are without merit. As to the recordings lost when A.C.'s phone malfunctioned (the second category), appellant offers no explanation in his brief as to how A.C. acted in bad faith. Nor do we believe the record suggests she did. With regard to the third category, appellant contends in his brief that A.C. "expressly stated she deleted recordings to prevent [appellant] from gaining access to them." (Appellant's Brief at 19, citing Tr. Vol. II at 296.) But he mischaracterizes her testimony. A.C. stated that she first downloaded the recordings to her daughter's phone *before* deleting them from her own phone. (Tr. Vol. II at 296.) A.C. was not asked if she ever intentionally deleted recordings before such transfer occurred.

{¶ 81} Without a showing that the evidence at issue was materially exculpatory or that the state acted in bad faith—let alone a showing of the existence of any suppressed evidence or state action—we overrule appellant's first assignment of error.

## B. Second Assignment of Error

{¶ 82} In his second assignment of error, appellant contends the trial court erred when it denied his request for a jury instruction on the adverse inference a jury is permitted to draw from the recordings the state may have not provided to defense counsel in discovery. Those arguments are not well-taken.

### 1. Controlling Law and Standard of Review

{¶ 83} The purpose of jury instructions is to properly guide the jury in deciding questions of fact based on the applicable substantive law. Thus, a trial court must give jury instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as fact finder. *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. In fact, in a criminal case, prejudicial error is found where a court fails to give an instruction that is pertinent to the case, states the law correctly, and is not covered by the general charge. *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992); *State v. Angel*, 10th Dist. No. 19AP-771, 2021-Ohio-4322, ¶ 67, quoting *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). Although a trial court "has broad discretion to decide how to fashion jury instructions," such instructions must "present a correct, pertinent statement of the law that is appropriate to the facts" of the case. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5; *State v. Lessin*, 67 Ohio St.3d 487, 493 (1993). No purpose is served by giving instructions on law that does not apply to the facts and circumstances of the case.

{¶ 84} We review a trial court's decision to deny requested jury instructions for an abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989); *State v. Robinson*, 10th Dist. No. 17AP-853, 2019-Ohio-558, ¶ 30. An abuse of discretion occurs when the trial court's decision was unreasonable, arbitrary, or unconscionable. *See, e.g.*, *State v. Brown*, 10th Dist. No. 22AP-38, 2022-Ohio-4073, ¶ 19, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19. An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.). *See also New Asian Super Mkt. v. Jiahe Weng*, 10th Dist. No. 17AP-207, 2018-Ohio-1248, ¶ 16.

### 2. Analysis

{¶ 85} Appellant timely filed his request for an adverse inference instruction. (Aug. 5, 2021 Defendant's Proposed Jury Instruction.) Before closing arguments, his trial counsel presented argument as to why the requested instruction was warranted. (Tr. Vol.

III at 539-43.) After closing arguments, the trial court formally denied the requested instruction. (Tr. Vol. IV at 593.) Appellant's trial counsel then objected to that decision on the record. (Tr. Vol. IV at 593.)

{¶ 86} An adverse inference may arise where a party who has control of the evidence in question fails, without satisfactory explanation, to provide the evidence to another party. *See*, *e.g.*, *Poseidon Environmental Servs. v. Nu Way Indus. Waste Mgt.*, *LLC*, 7th Dist. No. 16 MA 0083, 2017-Ohio-9407, ¶ 18, citing *Vidovic v. Hoynes*, 11th Dist. No. 2014-L-054, 2015-Ohio-712, ¶ 78, citing *Schwaller v. Maguire*, 1st Dist. No. C-02055, 2003-Ohio-6917, ¶ 24. In that situation, a jury is permitted to draw an inference that would be unfavorable to the party who has failed to produce the evidence in question. *See id*. Before giving such instruction to a jury, however, Ohio courts typically require a strong showing of malfeasance—or, at least, gross neglect. *See id*.

{¶ 87} As the state notes, the adverse inference instruction is generally applied in civil cases. (*See* Appellee's Brief at 14-15.) And this makes sense because parties in civil cases have equal discovery burdens and fewer constitutional protections than criminal defendants. In arguing this instruction should be extended to criminal cases, appellant cites as support a single case from another appellate district: *State v. Blankenship*, 9th Dist. No. 2815, 1994 Ohio App. LEXIS 4230 (Sept. 21, 1994). (Appellant's Brief at 23.)

{¶ 88} In *Blankenship*, the Ninth District Court of Appeals affirmed the trial court's refusal to give a similar instruction in a criminal case. *Id*. at *11-12. The defendant requested the adverse inference instruction because the state had physical evidence in its custody (ski mask and duffle bag) that it did not present to the jury. *Id*. During closing arguments, defense counsel was permitted to imply that such evidence would have been damaging to the state's case had it been presented. *Id*. But, the trial court refused to specifically instruct the jury that defense counsel's implication was appropriate. *Id*. at *12. Reviewing that refusal, the *Blankenship* court noted that defense counsel's closing arguments "were not evidence that could be considered by the jury" and "[t]here was no need for a specific instruction informing the jury that defendant's counsel's argument was not inappropriate." *Id*. at *13.

{¶ 89} Appellant contends that because the Ninth District did not expressly find such instruction to be wholly improper in criminal cases, the trial court erred in refusing to

give that instruction in this case. This argument is not well-taken. The *Blankenship* court did not rule upon whether the adverse inference instruction applies in criminal cases because it found the requested instruction was not necessary under the facts and circumstances of that case. The court's silence on the applicability of this instruction to criminal cases does not, however, equate to an endorsement of such application.

{¶ 90}   But beyond the failure to provide legal authority in support of this claim, and assuming an adverse inference instruction could be appropriate in criminal cases, we do not believe appellant adequately established the factual predicate to warrant such instruction anyway. The record does not establish that recordings beyond the six played for the jury were ever in the state's control. Indeed, appellant's trial counsel never claimed the prosecutor had additional recordings that simply were not turned over to the defense. (Tr. Vol. II at 299.) And, the prosecutor denied on the record that he did. (Tr. Vol. III at 438.) At most, the record suggests additional recordings *might* have been lost or deleted by A.C., or provided to a detective (who was not called to testify at trial) but not given to the prosecutor. Setting aside appellant's failure to adequately establish whether such evidence existed, appellant is unable to make a showing of malfeasance or gross neglect on the part of the prosecutor to warrant this instruction. Accordingly, we expressly decline to opine on whether an adverse inference instruction could be appropriate in a criminal case because we find it would not be factually warranted here.

{¶ 91}   For the foregoing reasons, we find the trial court did not abuse its discretion when it refused to give appellant's proposed jury instruction. Accordingly, we overrule his second assignment of error.

## C.  Fourth Assignment of Error

{¶ 92}   In his fourth assignment of error, appellant asserts the record does not support the trial court's imposition of consecutive sentences. We disagree.

### 1.  Controlling Law

{¶ 93}  When multiple prison terms are imposed, Ohio law presumes those sentences will run concurrently—not consecutively. R.C. 2929.41(A); *State v. Gwynne*, __ Ohio St.3d __, 2022-Ohio-4607, ¶ 10 ("*Gwynne II*"); *State v. Hitchcock*, 157 Ohio St.3d 215, 2019-Ohio-3246, ¶ 21.

{¶ 94} Under R.C. 2929.14(C)(4), however, a trial court is permitted to impose consecutive sentences, but only after it makes the mandatory sentencing findings prescribed by the statute. *See Gwynne II* at ¶ 10-11; *State v. Bates*, 118 Ohio St.3d 174, 2008-Ohio-1983, ¶ 15-16. Specifically, the trial court must find: (1) "the consecutive service is necessary to protect the public from future crime or to punish the offender"; (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and (3) one or more of R.C. 2929.14(C)(4)'s subsections apply. R.C. 2929.14(C)(4). *See also Gwynne II* at ¶ 10.

{¶ 95} Relevant here, R.C. 2929.14(C)(4)'s subsections require the trial court to find that either: (1) two or more offenses were committed as part of a course of conduct and the harm caused by the offenses was so great or unusual that a single prison term cannot adequately reflect the seriousness of the offender's conduct; or (2) the offender's criminal history demonstrates that consecutive sentences are needed to protect the public from the defendant committing future crimes. R.C. 2929.14(C)(4)(b) and (c). (*See* Sent. Tr. at 18.)

## 2. Appellate Review of Consecutive Sentences.

{¶ 96} The proper scope of felony sentence review by Ohio appellate courts, including review of consecutive sentences, is set forth in R.C. 2953.08(G)(2), which provides, in relevant part:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

*See State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, ¶ 16 ("*Gwynne I*"); *Gwynne II* at ¶ 10. To determine whether a trial court complied with R.C. 2929.14(C)(4), we must engage in a two-step analysis.

{¶ 97} We first review the record to confirm the trial court made the requisite consecutive sentence findings under R.C. 2929.14—"i.e., the first and second findings regarding necessity and proportionality, as well as the third required finding under R.C. 2929.14(C)(4)(a), (b), or (c)." *Gwynne II* at ¶ 25. The trial court must state the required findings at the sentencing hearing and incorporate those findings into the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 29. Although a "word-for-word recitation of the language of the statute is not required," a reviewing court must be able to discern that the trial court engaged in the correct analysis, and determine that the record contains evidence to support the trial court's findings. *Id.* A trial court is not required to state the precise reasons for its statutory findings on the record. *State v. Sullivan*, 10th Dist. No. 11AP-414, 2012-Ohio-2737, ¶ 24.

{¶ 98} If a trial court fails to properly make the required statutory findings, we "must hold that the order of consecutive sentences is contrary to law and either modify the sentence or vacate it and remand the case for resentencing." *Gwynne II* at ¶ 25, citing *Bonnell* at ¶ 36-37. Even if we find just one of the trial court's consecutive sentence findings not to be supported under the clear and convincing standard provided by R.C. 2953.08(G)(2), we must modify or vacate the trial court's consecutive sentence order. *Gwynne II* at ¶ 26, citing R.C. 2953.08(G)(2).

{¶ 99} If we instead determine the trial court properly made the necessary findings to impose consecutive sentences under R.C. 2929.14(C)(4), we must next evaluate whether the record clearly and convincingly supports those findings. *Gwynne II* at ¶ 26. " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.* at ¶ 19, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### 3. Analysis

{¶ 100} In this case, the trial court ran all of appellant's prison sentences consecutively, for an aggregate sentence of 50 years to life imprisonment. In support of its decision to impose consecutive sentences for all counts, the trial court stated that it found:

> [C]onsecutive sentences are necessary to protect the public from future crimes and to punish the offender; that it's not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public; and that the offenses are all part of one or more courses of conduct and the harm caused is so great or unusual, that a single prison term would not adequately reflect the seriousness of the offender's conduct.

(Sent. Tr. at 18.) The third finding relates to R.C. 2929.14(C)(4)(b).

{¶ 101} Appellant does not dispute that the trial court made the statutorily required consecutive sentence findings on the record (Sent. Tr. at 18) and incorporated those findings into the sentencing entry (Sept. 7, 2021 Jgmt. Entry at 2). Rather, he challenges the substance of the trial court's findings under R.C. 2929.14(C).

{¶ 102} Appellant first argues the record does not support findings under R.C. 2929.14(C)(4)(a) or (c). But, the trial court did not make findings under either subsection. (*See* Sent. Tr. at 18.) Thus, those arguments are not well-taken.

{¶ 103} Next, appellant contends "consecutive sentences are unnecessary for adequate punishment" because he "is already facing a life sentence." (Appellant's Brief at 33.) But he provides no support for his proposition that, because consecutive sentences might be superfluous, a trial court cannot (or should not) order a defendant to consecutively serve multiple mandatory prison sentences when at least one carries a life tail. *Compare with State v. Blanton*, 4th Dist. No. 16CA1031, 2018-Ohio-1275, ¶ 102 (finding a similar argument to be "disingenuous and completely unpersuasive"); *State v. Townsend*, 8th Dist. No. 110525, 2022-Ohio-692, ¶ 18. Because appellant fails to offer any legal authority to support this argument, we decline to address this portion of his assignment of error. *See* App.R. 12(A)(2) and 16(A)(7). And, in any event, we do not find this argument compelling, given the record in this case.

{¶ 104} Appellant finally argues the trial court's finding under R.C. 2929.14(C)(4)(b) is not clearly and convincingly supported by the record. (Appellant's Brief at 33-34.) R.C. 2929.14(C)(4)(b) states: "At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."

{¶ 105} In support of his arguments involving this statutory factor, appellant makes a blanket assertion—without providing any legal support—that the harm R.S. suffered "is not unique" from others like it because all "victims of this type of offense suffer[] this type of harm." (Appellant's Brief at 33-34.) But he fails to develop this argument in his brief or offer any legal authority in support of it. He also does not, for instance, compare the sentence imposed and facts of his case with others to justify or bolster his contention that the harm here is not unique. *Compare with State v. Glover*, 1st Dist. No. C-220088, 2023-Ohio-1153, ¶ 75-79.

{¶ 106} Nevertheless, following a thorough review of the record, we cannot say that it clearly and convincingly fails to support the trial court's findings under R.C. 2929.14(C)(4)(b). We first note that appellant does not dispute the first clause of R.C. 2929.14(C)(4)(b): "At least two of the multiple offenses were committed as part of one or more courses of conduct." Because the offenses for which appellant was sentenced occurred many times for approximately six years, the record clearly and convincingly supports this component of the trial court's finding.

{¶ 107} As for the second sentence of R.C. 2929.14(C)(4)(b)—"the harm caused by two or more of *the multiple offenses* so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct"—we also find this component to be clearly and convincingly supported by the record. (Emphasis added.) The focus of R.C. 2929.14(C)(4)(b) is the harm caused by the multiple offenses. If the harm caused by the multiple offenses is so great that no single prison term for any one of the offenses sufficiently reflects the seriousness of the offender's conduct, then consecutive sentences may be appropriate. *See Gwynne I*, 2022-Ohio-4607 at ¶ 15, fn. 2.

{¶ 108} Appellant first came into R.S.'s life when she was 7 years old. Before she was 10 years old, he began sexually abusing her regularly, until 2018, when she was 14. During this time, appellant caused R.S. to feel disconnected from her family. (Tr. Vol. II at 249-51, 279-80, 283-85, 321-22, 324; Sent. Tr. at 9.) As R.S.'s stepfather, appellant was in a position of trust and control, which he used to facilitate the ongoing abuse and manipulate R.S. into performing sexual acts. (*See* Tr. Vol. II at 226, 236-37.) Appellant called R.S. by her mother's name, and directed R.S. to pretend that she was her mother. (Tr. Vol. II at 228.) He also convinced R.S. she could not be loved by anyone else, and distorted her understanding of a healthy relationship. (*See* Sent. Tr. at 6-7. *See also* Tr. Vol. III at 360.)

{¶ 109} The record shows appellant continued sexually abusing R.S. even after R.S. disclosed to him in 2014 that she was being sexually abused by his son. Indeed, the abuse continued until 2018, when R.S. reported it to law enforcement. Once these allegations came to light, appellant denied they were true. He tried to convince A.C. that R.S. was lying. (Tr. Vol. II at 335-38.) In fact, A.C. initially asked the lead detective to close her investigation into the allegations her own daughter made, and the lead detective honored that request. (Tr. Vol. II at 335; Tr. Vol. III at 460-66.) In the recorded conversations between appellant and A.C. played at trial, appellant downplayed his role, asserted the sexual conduct was mutual, and blamed R.S. by suggesting she did things to entice him. (*See, e.g.*, Trial Ex. E-2, E-3, E-4, and E-5.) Again, the only reason the abuse stopped was because the offenses were reported to the police by R.S.

{¶ 110} As a result of the sexual abuse, R.S. indicated she still suffers from anxiety and lack of trust. (Sent. Tr. at 6-7.) She described avoiding or having negative reactions to regular activities—showering, eating certain foods, flinching when touched by her friends—because she associated those activities with the "terrible things" appellant had done to her. (Sent. Tr. at 7.) When she presented to Nationwide CAC on August 7, 2018, R.S. reported engaging in self-harm behavior and having frequent suicidal thoughts. (Tr. Vol. III at 392-94. *See also* Tr. Vol. II at 249.)

{¶ 111} The record of this case indicates the nature of the offenses, the severity of appellant's course of criminal conduct over a lengthy period of time, and the psychological harm to R.S. all contribute to our determination that the record clearly and convincingly supports the trial court's findings that the offenses were more serious than conduct

normally constituting the offenses of rape and sexual battery, and that the harm caused was so great or unusual that no single prison term for any of the offenses committed adequately reflects the seriousness of his conduct.

{¶ 112} For these reasons, appellant's fourth assignment of error is overruled.

### D. Fifth Assignment of Error

{¶ 113} In his fifth assignment of error, appellant argues the trial court erred in sentencing him to the maximum available prison term. We disagree.

### 1. Controlling Law

{¶ 114} R.C. 2929.11 addresses the purposes of felony sentencing. It provides as follows:

> (A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

> (B) A sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

> (C) A court that imposes a sentence upon an offender for a felony shall not base the sentence upon the race, ethnic background, gender, or religion of the offender.

{¶ 115} R.C. 2929.12 addresses factors to be taken into account when imposing a sentence under R.C. 2929.11:

> Unless otherwise required by section 2929.13 or 2929.14 of the Revised Code, a court that imposes a sentence under this

> chapter upon an offender for a felony has discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code. In exercising that discretion, the court shall consider the factors set forth in [divisions (B) through (F)] of this section * * * and, in addition, may consider any other factors that are relevant to achieving those purposes and principles of sentencing.

R.C. 2929.12(A). R.C. 2929.12(B) through (F) then set out factors for the sentencing court to consider, including the seriousness of the defendant's conduct and likelihood of recidivism.

{¶ 116} It is well-settled that neither R.C. 2929.11 nor 2929.12 requires a trial court to make any specific factual findings on the record. *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, ¶ 20, citing *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, ¶ 31; *State v. Arnett*, 88 Ohio St.3d 208, 215 (2000). *See also State v. Holloman*, 10th Dist. No. 07AP-875, 2008-Ohio-2650, ¶ 18; *State v. Ibrahim*, 10th Dist. No. 13AP-167, 2014-Ohio-666, ¶ 20, citing *State v. Peterson*, 10th Dist. No. 12AP-646, 2013-Ohio-1807, ¶ 31.

### 2. Standard of Review

{¶ 117} As described above, the proper scope of felony sentence appellate review is set forth in R.C. 2953.08(G)(2). Under this statute, appellate courts are not permitted to weigh the evidence and alter a sentence under R.C. 2929.11 and 2929.12. *Jones* at ¶ 42. Appellate review of a sentence that is "otherwise contrary to law" is permitted, however, under R.C. 2953.08(G)(2)(a). Otherwise contrary to law means " 'in violation of statute or legal regulations.' " *Jones* at ¶ 34, quoting *Black's Law Dictionary* 328 (6th Ed.1990).

### 3. Analysis

{¶ 118} In this case, the record reflects, and appellant concedes, the trial court considered and applied the appropriate statutory sentencing criteria and imposed a sentence authorized by applicable law. (Sent. Tr. at 16-19; Sept. 7, 2021 Jgmt. Entry.)

{¶ 119} Appellant instead argues the trial court's imposition of a maximum prison sentence is "otherwise contrary to law." This is because, he contends, the trial court improperly "used extraneous factors outside of those laid out in R.C. 2929.11 and 2929.12." (Appellant's Brief at 35-37.) Specifically, he points to the uncharged criminal allegations described in statements provided by R.S. and A.C. during the sentencing hearing. Appellant

argues these "additional allegations tainted the sentencing" and the trial court should not have considered these "improper factors." His contentions are not compelling, for two reasons. (Appellant's Brief at 37.)

{¶ 120} First, the record contravenes his factual assertions. After appellant's trial counsel objected to R.S.'s and A.C.'s statements at sentencing, the trial court stated that it had "read them, but at the end of the day[,] will base its ruling and [the] sentence [it imposes] on the purposes and principles of sentencing and the law." (Sent. Tr. at 12-14.) We find there to be nothing in the record that contradicts that statement.

{¶ 121} Second, even had the trial court considered uncharged other acts evidence when sentencing appellant, consideration of such information is permissible. " 'Courts have consistently held that evidence of other crimes, including crimes that never result in criminal charges being pursued, or criminal charges that are dismissed as a result of a plea bargain, may be considered at sentencing.' " *State v. Dixon*, 4th Dist. No. 21CA8, 2022-Ohio-2807, ¶ 31, quoting *State v. Starkey*, 7th Dist. No. 06 MA 110, 2007-Ohio-6702, ¶ 16, citing *State v. Cooey*, 46 Ohio St.3d 20, 35 (1989). *See also State v. Banks*, 10th Dist. No. 10AP-1065, 2011-Ohio-2749, ¶ 24, citing *State v. Wiles*, 59 Ohio St.3d 71, 78 (1991), *State v. Bowser*, 186 Ohio App.3d 162, 2010-Ohio-951, ¶ 16 (2d Dist.), and *Starkey* at ¶ 19. Indeed, " '[c]ourts have historically been permitted to consider hearsay evidence, evidence of an offender's criminal history, the facts concerning charges dismissed, and even offenses for which charges were not filed, but were addressed in the presentence investigation ("PSI").' " *State v. Steele*, 8th Dist. No. 105085, 2017-Ohio-7605, ¶ 10, quoting *State v. Ropp*, 3d Dist. No. 14-13-21, 2014-Ohio-2462, ¶ 4. "A caveat is that uncharged conduct cannot be 'the sole basis for the sentence.' " *Steele* at ¶ 10, quoting *State v. Gray*, 8th Dist. No. 91806, 2009-Ohio-4200, ¶ 13, citing *State v. Williams*, 8th Dist. No. 79273, 2002 Ohio App. LEXIS 453, *24 (Feb. 7, 2002).

{¶ 122} The trial court imposed prison terms for all counts that were within the applicable statutory ranges. Even if uncharged conduct was considered by the trial court at sentencing, the record is clear that it was only one factor among many the trial court considered in its sentencing decision. (*See*, *e.g.*, Sent. Tr. at 16.) Based on the foregoing, we cannot conclude the trial court acted contrary to law. Accordingly, appellant's fifth assignment of error is overruled.

### E. Sixth Assignment of Error

{¶ 123} In his sixth assignment of error, appellant contends his convictions were against the manifest weight of the evidence. We disagree.

#### 1. Controlling Law and Standard of Review

{¶ 124} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See, e.g.*, *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-87 (1997). "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43. "Weight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, citing *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *Thompkins* at 387.

{¶ 125} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, we sit as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, ___ Ohio St.3d ___, 2022-Ohio-4175, ¶ 26. In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See, e.g.*, *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10; *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 126} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g.*, *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-131, 2021-Ohio-3803, ¶ 64, citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *See also State v. Brightwell*, 10th Dist. No. 18AP-

243, 2019-Ohio-1009, ¶ 33. The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.* at 80.

{¶ 127} This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact, *DeHass* at paragraph one of the syllabus, and the trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest," *State v. Antill*, 176 Ohio St. 61, 67 (1964). Further, to reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### 2. Analysis

{¶ 128} Our analysis of appellant's manifest weight challenge is limited to the offenses charged in Counts 5, 7, 9, 11, and 12 for which he was sentenced, as Counts 6, 8, 10, and 13 were merged for purposes of sentencing.[2] *See State v. McKinney*, 10th Dist. No. 08AP-23, 2008-Ohio-6522, ¶ 44. *See also State v. Kpoto*, 10th Dist. No. 19AP-492, 2020-Ohio-3866, ¶ 13, 16-21.

{¶ 129} Counts 5 and 7 concerned rape by fellatio of a child under the age of 10, in violation of R.C. 2907.02(A)(1)(b) and (B). Count 9 concerned rape by fellatio of a child under the age of 13, in violation of R.C. 2907.02(A)(1)(b). Count 11 concerned attempted rape by anal penetration of a child under the age of 13, in violation of R.C. 2907.02(A)(1)(b). And Count 12 concerned sexual battery by fellatio, when appellant was the stepfather of R.S., in violation of R.C. 2907.03(A)(5).

{¶ 130} Appellant's manifest weight challenge pertains exclusively to the "sexual conduct" element of these five counts. In his merit brief, he argues that since there was conflicting testimony about the sexual conduct throughout the trial, his convictions were against the manifest weight of the evidence. He contends the jury made inconsistent

---

[2] If we found appellant's convictions under Counts 5, 7, 9, or 12 to be against the manifest weight of the evidence, however, we would also evaluate the evidence underlying the offenses charged in Counts 6, 8, 10, and 13. Such additional analysis is not necessary in this case.

determinations of R.S.'s credibility because it found him not guilty of Counts 1 through 4 but guilty of all other counts. He proffers that "[t]he only major difference between the counts for which [he] was convicted and those he was acquitted was [his] ability to disprove the new accusations," which formed the basis for Counts 1 through 4. (Appellant's Brief at 40.) Appellant also argues R.S. presented conflicting testimony regarding the 2018 allegations (of which he was found not guilty) and the circumstances surrounding A.C.'s presence in the home. (*See* Appellant's Brief at 40-41.)

{¶ 131} While there was conflicting testimony presented at trial, a defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented." *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29. *See also State v. J.E.C.*, 10th Dist. No. 12AP-584, 2013-Ohio-1909, ¶ 42. The jury may consider conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or otherwise resolving the discrepancies. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 34, citing *Midstate Educators Credit Union, Inc. v. Werner*, 175 Ohio App.3d 288, 2008-Ohio-641, ¶ 28 (10th Dist.). " 'The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact.' " *Petty*, 2017-Ohio-1062, at ¶ 63, quoting *State v. Mullins*, 10th Dist. No. 16AP-236, 2016-Ohio-8347, ¶ 39.

{¶ 132} On review, we reject appellant's claim that his convictions were against the manifest weight of the evidence. Appellant's manifest weight challenge hinges on R.S.'s lack of credibility, but ignores other evidence presented at trial—specifically, his six recorded conversations with A.C. When repeatedly questioned by A.C. about R.S.'s allegations, appellant did not deny all of the acts of abuse she alleged. Instead, he minimized the traumatic nature of the abuse (*See, e.g.*, Trial Ex. E-1 at 9:55; Tr. Vol. II at 305-06; Trial Ex. E-6 at 20:45) and claimed that only half of R.S.'s allegations were untrue (Trial Ex. E-1 at 10:05). Appellant also assured A.C. he would not "do this stuff again." (Trial Ex. E-1 at 3:50; Tr. Vol. II at 305. *See also* Trial Ex. E-5 at 10:50; Tr. Vol. II at 314.) And he suggested R.S. was an active participant in the sexual encounters. (Trial Ex. E-2 at 7:43, 9:40, 11:50; Tr. Vol. II at 307-08; Trial Ex. E-3 at 20:25.)

{¶ 133} Appellant admitted to engaging in mutual oral sex with R.S. (Trial Ex. E-2 at 13:25; Tr. Vol. II at 308. *See also* Trial Ex. E-6 at 20:45.) And when A.C. asked him if R.S. was still a virgin, appellant denied having sexual intercourse with R.S. (Trial Ex. E-2 at 13:00.) These statements do not contradict R.S.'s allegations and are consistent with the state's factual allegations underlying the offenses for which he was convicted. Counts 5, 7, 9, and 12 related to fellatio, and Count 11 alleged *attempted* anal penetration.

{¶ 134} " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding * * * as being against the manifest weight of the evidence.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. The jury, as trier of fact, was in the best position to consider the discrepancies in the testimony regarding whether, when, and how often R.S. performed fellatio on appellant. The jury was also in the best position to evaluate the credibility of R.S.'s testimony about appellant attempting anal penetration.

{¶ 135} The jury was likewise free to disbelieve appellant's statements as to when, how often, what, or where the abuse occurred. And the jury was free to find appellant was not a credible witness, as his trial testimony denying all sexual encounters with R.S. was not consistent with his statements on the six recordings. For instance, in one recording, appellant indicated the abuse happened after R.S. made the allegations about his son in 2014. (Trial Ex. E-1 at 11:10.) He told A.C. the encounters with R.S. began at their Chatterly residence (Trial Ex. E-3 at 27:58; Tr. Vol. II at 311), and more specifically, in their living room (Trial Ex. E-4 at 14:30) and their bedroom (*see* Trial Ex. E-6 at 17:23.). Appellant explained why he engaged in sexual conduct with R.S. (Trial Ex. E-4 at 13:05, 17:10; Trial Ex. E-3 at 27:55.)

{¶ 136} Given appellant's inculpatory statements on the six recordings, we cannot say this is one of the rare cases where the trier of fact clearly lost its way in believing R.S.'s testimony that fellatio occurred between R.S. and appellant on multiple occasions, as was alleged in Counts 5, 7, 9, and 12. Nor can we say the jury clearly lost its way in believing R.S.'s testimony about the attempted anal rape alleged in Count 11.

{¶ 137} Therefore, we conclude appellant's convictions for Counts 5, 7, 9, 11, and 12 are not against the manifest weight of the evidence and overrule his sixth assignment of error.

### F. Seventh Assignment of Error

{¶ 138} In his seventh assignment of error, appellant contends the evidence at trial was insufficient to support his convictions.

#### 1. Controlling Law and Standard of Review

{¶ 139} The issue of whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial. *See, e.g., State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *Thompkins*, 78 Ohio St.3d at 386. We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. We essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime. *State v. Watkins*, 10th Dist. No. 16AP-142, 2016-Ohio-8272, ¶ 31, quoting *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

#### 2. Analysis

{¶ 140} Appellant generally contends Counts 5 through 13 are not supported by sufficient probative evidence because no physical evidence of any offense was presented at trial and R.S. was not a credible witness. (Appellant's Brief at 44.) These arguments, however, pertain not to the sufficiency of evidence, but to the manifest weight. Having already overruled appellant's manifest weight challenge in the sixth assignment of error, this portion of his argument is not well-taken.

{¶ 141} Appellant also argues the state failed to present sufficient probative evidence establishing R.S. was under the age of 10 for the rape by fellatio offense charged in Count 7

to support the guilty verdict for the under-10 specification. (Appellant's Brief at 42-44.) We disagree.

{¶ 142} R.S. testified about sexual conduct (fellatio) that occurred at the family's Bar Harbor home multiple times. (Tr. Vol. II at 222-26.) She testified that she was 8 when she moved to that residence and left "shortly after" her 10th birthday. (Tr. Vol. II at 223-26.) A.C. testified the family lived at the Bar Harbor residence from October 2012 until September/October 2014. (Tr. Vol. II at 289.) Because R.S. was born in June 2004, she was under 10 for approximately 1 year and 8 months out of 2 years the family spent in that home. R.S. described the acts as occurring many times, often, and for a duration of almost 7 years. (*See*, *e.g.*, Tr. Vol. II at 218, 221-28, 231-34, 236-37, 239-40.) And R.S. testified that appellant performed oral sex on her before she turned 10:

> [STATE:] And what would he do once you were sitting on his face?
>
> [R.S.:] He would perform oral sex on me.
>
> [STATE:] Okay. So his mouth was touching your vagina?
>
> [R.S.:] Yes.
>
> [STATE:] And that's something that started once you moved to Chatterly Lane?
>
> [R.S.:] No, that would happen when we lived in Bar Harbor too.
>
> [STATE:] Okay. So it started before Chatterly Lane?
> [R.S.:] Yes.
>
> [STATE:] So that's before you even turned 10?
>
> [R.S.:] Yes.

(Tr. Vol. II at 228-29.)

{¶ 143} Construing the evidence in the light most favorable to the state, a reasonable trier of fact could have found the state proved, beyond a reasonable doubt, that appellant engaged in fellatio with R.S. when she was younger than the age of 10 based on R.S.'s

testimony. Therefore, we conclude appellant's conviction for Count 7 is supported by sufficient evidence.

{¶ 144} For the foregoing reasons, appellant's seventh assignment of error is overruled.

### G. Third Assignment of Error

{¶ 145} In his third assignment of error, appellant argues he received ineffective assistance of counsel. Those arguments are not well-taken.

#### 1. Controlling Law and Standard of Review

{¶ 146} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or objectively unreasonable, as determined by " 'prevailing professional norms' " and (2) that the deficient performance of counsel prejudiced the defendant. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, ¶ 77, quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

{¶ 147} To show that trial counsel's performance was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 148} Prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley* at 142, quoting *Strickland* at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.*, quoting *Strickland* at 694.

{¶ 149} When analyzing an ineffective assistance of counsel claim, an appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. *See also State v. Wade,* 10th Dist. No. 20AP-456, 2021-Ohio-4090, ¶ 19. "If it is easier

to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Strickland* at 697.

### 2. Analysis

{¶ 150} Appellant asserts his trial counsel was ineffective in three ways: (1) failing to object to the introduction of prior bad acts of domestic violence; (2) failing to request an "other acts" instruction, as contemplated by *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440; and (3) failing to object to the presentation and admission of the entire Nationwide CAC report without redactions. (Appellant's Brief at 28-34.) Additionally, appellant asserts the cumulative effect of counsel's alleged errors rendered his trial counsel ineffective.

{¶ 151} As to the merits of each ineffective assistance allegation, the state argues appellant fails to rebut the presumption that his trial counsel provided him with adequate representation. The state also contends that appellant has failed to demonstrate how he was prejudiced by any of the alleged errors individually or cumulatively.

### a. Failure to object to testimony and evidence about prior bad acts of domestic violence

{¶ 152} Appellant first alleges his attorney was ineffective for failing to object to the introduction of irrelevant and inadmissible prior bad acts evidence presented to the jury through the testimony of R.S., Alicia Daniels (the forensic interviewer at Nationwide Children's Hospital), and A.C., and through State's Exhibit B (Ms. Daniels's report). This evidence pertained to the allegation that appellant previously committed domestic violence against his wife.

{¶ 153} While explaining her strained relationship with A.C., R.S. stated: "There was always a fight or [appellant] would hit [A.C.]. You would hear her screaming from downstairs. We just -- we weren't allowed to have any kind of connection with her or each other." (Tr. Vol. II at 251.) A.C. testified that appellant "was arrested for assaulting" her. (Tr. Vol. II at 294.) And Ms. Daniels testified that, in her forensic interview, R.S. "talked about exposure to some domestic violence from her stepfather towards her mother," "physical abuse from her stepfather towards her siblings," physical abuse towards herself, and "a lot of emotional maltreatment." (Tr. Vol. III at 359.) Ms. Daniels's report also

reflected a history of domestic violence in the home. (Trial Ex. B at 4, 27, 44, 52.) No specific details about the domestic violence were presented at trial.

{¶ 154} Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). However, this evidence may be relevant for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*; *accord* R.C. 2945.59. The list of permitted purposes in Evid.R. 404(B) is not exhaustive. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 18. Rather, "evidence of other crimes, wrongs, or acts may be admissible for any purpose material to the issue of guilt or innocence, as long as it is not being introduced for the purpose of showing the accused's propensity to commit bad acts." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 49 (2d Dist.). But, even if evidence is relevant, it is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 155} Appellant concedes in his brief that "the claims of domestic violence[,] [at most,] help form the background and explain why there was a lack of reporting on behalf of R.S." (Appellant's Brief at 28.) Thus, he arguably concedes the evidence was relevant under Evid.R. 401.

{¶ 156} Ultimately, appellant argues his trial counsel's failure to object to this evidence under Evid.R. 403 constituted deficient performance. Generally, he contends that the brief and vague reference to these prior domestic violence incidents tainted the jury's perception of him. (Appellant's Brief at 29.) Again, appellant concedes relevance but asserts such evidence was unfairly prejudicial. Given that there were only four references to this other-acts evidence over the course of a four-day trial, and that these references were not descriptive and did not amount to anything more than a brief mention of the prior history, we find that trial counsel's objection to such testimony and evidence would have been futile and not likely sustained if made.

{¶ 157} Defense counsel's failure to object to *admissible* evidence does not constitute deficient performance under *Strickland. See, e.g., State v. Tyler*, 10th Dist. No. 05AP-989, 2006-Ohio-6896, ¶ 40. "Counsel is certainly not deficient for failing to raise a meritless issue." *State v. Issa*, 93 Ohio St.3d 49, 68 (2001). Appellant has failed to demonstrate that an objection to this other-acts evidence would have been successful; thus, we find he has not demonstrated deficient performance.

{¶ 158} And, assuming arguendo that the challenged other-acts evidence was inadmissible, "[f]ailure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988). *See also State v. Pawlak*, 8th Dist. No. 99555, 2014-Ohio-2175, ¶ 81-83; *State v. Taylor*, 10th Dist. No. 12AP-870, 2013-Ohio-3699, ¶ 33-35. As the Supreme Court of Ohio has explained:

> "[E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

{¶ 159} In this case, defense counsel's failure to object can be reasonably viewed as trial strategy or tactical choice. This was a situation where a single offhand reference was made to domestic violence on a few independent occasions. The reference was not detailed and, once it was made by the witness, the prosecutor did not pursue any additional inquiry about the topic. Objecting in each of these separate instances could have brought a heightened awareness to the testimony—something trial counsel might have intended to avoid. Accordingly, we find trial counsel's failure to object to minor references such as those presented here, even if erroneous, may have been a reasonable tactical choice. For these reasons, we conclude counsel's failure to object to this other-acts evidence did not constitute deficient performance.

{¶ 160} Moreover, appellant fails to demonstrate prejudice, or a reasonable probability that, but for his trial counsel's failure to object to these brief and non-descriptive references to alleged domestic violence incidents between appellant and A.C., the result of the proceeding would have been different. Appellant broadly contends that "[t]he repeated introduction of [this other-acts evidence] tainted the [jury's] view of [him]," and cast him "as someone prone to commit crime." (Appellant's Brief at 29.) However, the jury's verdict, which included acquittals on four counts, belies his claim that the admission of irrelevant and inadmissible other-acts evidence generally tainted the jury's view of him, so as to satisfy *Strickland*'s prejudice prong.[3] *See, e.g., State v. Gardner*, 2d Dist. No. 21357, 2010-Ohio-6479, ¶ 33.

{¶ 161} Additionally, the state produced ample evidence supporting the counts of which the jury found appellant guilty. R.S. provided direct testimony of appellant's sexual conduct and provided a description of appellant's penis that was consistent with A.C.'s description. And, importantly, the state played six recordings containing appellant's inculpatory statements, acknowledgments, and admissions relating to the sexual conduct R.S. described. On those six recordings, appellant never expressly denied engaging in any sexual encounters with R.S. He admitted to some (namely, mutual oral sex), told A.C. where the first encounter happened (living room of their Chatterly residence), informed A.C. where other encounters occurred (the marital bed, for instance), justified his actions (e.g., he was fighting with A.C. and R.S. was not innocent), and repeatedly apologized for his actions. Although appellant unequivocally denied all allegations in his trial testimony, his credibility was undoubtedly undermined by the inculpatory statements he made on those

---

[3] The state also generally posits appellant's trial counsel was "obviously somewhat effective, as the jury acquitted [appellant] on some counts." (*See* Appellee's Brief at 21.) Fundamentally, we caution against the notion that an acquittal on some counts is inherently indicative of trial counsel's effective performance under *Strickland* as to **all counts**. For instance, in *Pawlak*, 2014-Ohio-2175, the defendant was charged in a 26-count indictment with offenses related to 5 different victims. Notwithstanding the state's voluntary dismissal of 3 counts, the trial court's judgment of acquittal on 4 counts pursuant to defense counsel's Crim.R. 29 motion, and the jury's acquittal of the defendant on 12 counts, the Eighth District found that numerous errors made by defense counsel during trial constituted ineffective assistance of counsel, sustained the assigned errors, and ordered a new trial. *See also State v. Smith*, 2d Dist. No. 2003-CA-23, 2004-Ohio-665.

six recordings. Accordingly, in light of this evidence, we do not believe trial counsel's failure to object to the other-acts evidence impacted the outcome of appellant's trial.

{¶ 162} Based on the foregoing, we find trial counsel's failure to object to other-acts evidence concerning prior domestic violence against A.C. did not constitute ineffective assistance of counsel.

### b. Failure to request an other-acts evidence limiting instruction

{¶ 163} Appellant also contends his trial counsel's failure to request a limiting instruction concerning the other-acts evidence constituted ineffective assistance of counsel. As appellant notes, when other-acts evidence is presented at trial, " 'a court should explain both the specific purpose for which the evidence may be considered and the rationale for its admission on the record.' " (Appellant's Brief at 30, quoting *Hartman*, 2020-Ohio-4440 at ¶ 34.)

{¶ 164} Such instruction is given, where appropriate, to mitigate the risk of a jury using such evidence improperly. The Supreme Court has cautioned trial courts, however, about giving such limiting instruction *sua sponte* any time other-acts evidence is presented at trial. "Depending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury." *Hartman* at ¶ 67, citing *State v. Schaim*, 65 Ohio St.3d 51, 61 (1992), fn. 9 ("the decision not to request a limiting instruction is sometimes a tactical one, and we do not wish to impose a duty on the trial courts to read this instruction when it is not requested").

{¶ 165} As courts, including this one, have recognized, trial counsel may decide, as a matter of trial strategy, not to request a limiting instruction due to concerns that a limiting instruction "will only emphasize in the juror's minds the evidence of other criminal acts committed by the defendant, thereby reinforcing the prejudice." *Strongsville v. Sperk*, 8th Dist. No. 91799, 2009-Ohio-1615, ¶ 38. *See State v. Hester*, 10th Dist. No. 02AP-401, 2002-Ohio-6966, ¶ 15 ("Counsel may have declined to request a limiting instruction regarding appellant's prior convictions out of concern that, if such an instruction were given, the prior convictions would be once again called to the jury's attention."). The defense's trial strategy in this case was to undermine the credibility of R.S. and A.C., emphasize the lack of physical evidence, even with appellant's cooperation, and add context to the inculpatory statements

appellant made on the six recordings. Given the brief, vague, and infrequent references to prior domestic violence incidents involving A.C., we find the decision not to request a limiting instruction was consistent with the trial strategy of appellant's trial counsel.

{¶ 166} Moreover, as described in the previous section, the state produced ample evidence supporting all counts on which appellant was convicted, including testimony from R.S. and inculpatory statements made by appellant conceding he engaged in some sexual conduct with R.S. Accordingly, we do not find his trial counsel's failure to request a limiting instruction impacted the outcome of trial.

{¶ 167} Based on the foregoing, we find appellant fails to demonstrate either the deficient performance or prejudice *Strickland* requires to support this allegation of ineffective assistance of counsel.

### c. Allowing the full Nationwide CAC report to be presented and admitted as evidence without redactions

{¶ 168} Appellant also argues his trial counsel was ineffective in failing to object to the presentation and admission of the entire Nationwide CAC report (Trial Ex. B), without redactions. (Appellant's Brief at 29-30.) He specifically takes issue with two sections, and generally alleges that "[m]any of the statements found in the report cannot be attributed to seeking medical treatment" under Evid.R. 803(4). (*See id.*) Our analysis is limited to the specific passages appellant identifies in his brief. *See, e.g., State v. C.C.B.*, 10th Dist. No. 18AP-782, 2019-Ohio-3631, ¶ 38, citing *In re L.W.*, 10th Dist. No. 17AP-587, 2018-Ohio-2099, ¶ 46; App.R. 16(A)(7).

{¶ 169} At oral argument before this court, the state conceded that not all statements contained in the Nationwide CAC report were admissible as statements for purposes of medical diagnosis or treatment under Evid.R. 803(4). The state also agreed the Nationwide CAC report should not have been admitted in its entirety and that some of the extraneous statements should have been redacted. Nonetheless, the state maintains that appellant fails to demonstrate that his trial counsel was ineffective for failing to object to the admission of the entire report or that the improper admission of this unredacted report affected the outcome of trial.

{¶ 170} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of

the matter asserted." Hearsay is generally inadmissible unless an exception applies. Evid.R. 802. Pertinent here, Evid.R. 803 excludes various items from the hearsay rule, "even though the declarant is available as a witness," including "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). The term "medical diagnosis" in Evid.R. 803(4) includes a mental health diagnosis. *State v. R.L.R.*, 10th Dist. No. 18AP-971, 2020-Ohio-4577, ¶ 16, citing *In re S.A.*, 12th Dist. No. CA2017-07-092, 2017-Ohio-8792, ¶ 41. *See also State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 33-44.

{¶ 171} " '[Evid. R.] 803(4) encompasses statements made by persons who bring the patient to the hospital or doctor's office, as long as the third person's statements are in subjective contemplation of treatment or diagnosis. * * * Where, however, circumstances indicate the third [person] is merely speculating as to facts relating to the injury, exclusion may be warranted since the essential element of reliability is not present.' " *State v. Thompson*, 2d Dist. No. 22984, 2010-Ohio-1680, ¶ 24, quoting Weissenberger's *Ohio Evidence* Courtroom Manual 583 (2008). *See also State v. Airwyke*, 11th Dist. No. 2006-T-0073, 2007-Ohio-3199, ¶ 21. The hearsay exception provided by Evid.R. 803(4) is limited to those statements made by the patient (or third party who brought the patient to the medical facility) which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted. *State v. Boston,* 46 Ohio St.3d 108, 121 (1989).

{¶ 172} *First*, appellant takes issue with some of the "order comments" in the "Referral to Behavioral Health/Psychiatry/Psychology" section of that report, which describe R.S.'s "pertinent past history" as follows:

> "Chronic exposure to DV against mother by her biofather and stepfather. Family currently in fear of being killed by stepfather[] now that patient has disclosed. She was sexually abused by stepfather's son in the past, and she was seen in 2014 in our CAC for that at the time. The stepfather's son is serving prison time currently for the crime. Patient did not disclose about stepfather until today (8/7); however, they were both

> sexually abusing her during the same time periods. Stepfather continued after the stepbrother was incarcerated."

(Appellant's Brief at 29, quoting Trial Ex. B at 18.)

{¶ 173} Appellant concedes the rule permits Dr. Brink to "repeat the allegations made by R.S., assuming they were for the purpose of medical treatment," but takes issue with the fact that this paragraph is Dr. Brink's summary of R.S.'s responses during her forensic interview at Nationwide CAC—i.e., they are not framed as the "words of R.S." (Appellant's Brief at 29.) He contends this paragraph contains an out-of-court statement "made by a medical professional that [improperly] asserts that a crime—the one [appellant] is on trial for—occurred." (Appellant's Brief at 29.) Since this paragraph is designated as R.S.'s "pertinent past history," however, it can be inferred that the information in this paragraph came from statements made by R.S. (or A.C.) for purposes of medical treatment and diagnosis. And because this paragraph is included as part of Dr. Brink's referral of R.S. to a mental health provider, context clearly indicates it reflects a summary of information obtained from R.S. and A.C. that Dr. Brink believed was pertinent to this referral—not an improper opinion that the charged offenses actually occurred. Accordingly, this argument is not well-taken.

{¶ 174} Appellant also argues this paragraph improperly "states, as fact, that the family is now in fear of [being killed by] him," which he claims "implies that [appellant] has a guilty consci[ence]." (Appellant's Brief at 29-30.) Without further explanation, we cannot ascertain how the former implies the latter. In any event, we agree that information about *the family's* fear of appellant killing them was arguably not made for purposes of *R.S.'s* medical treatment and diagnosis. It was thus not admissible under Evid.R. 803(4). Finding this statement to be inadmissible hearsay, a pretrial motion to suppress this statement (or objection at trial) would not have been futile and would likely have been sustained if made, as there would be no justification for its admission. Accordingly, we must next consider whether failing to object constituted deficient performance.

{¶ 175} Failing to object to irrelevant and prejudicial testimony may sometimes be viewed as tactical. In this case, however, counsel's failure to seek exclusion of the statement that the family is afraid appellant will kill them cannot reasonably be viewed as trial strategy or tactical choice. Defense counsel had this report prior to trial. We acknowledge that there

may be strategy involved in an attorney's decision not to object to evidence during trial; but, in this case, that would not have been necessary. A pretrial suppression motion could have been filed, or defense counsel could have moved for redaction of this statement outside of the presence of the jury. Thus, we find there was no tactical reason to acquiesce to its inclusion in the admitted report.

{¶ 176} Appellant argues prejudice under *Strickland* by claiming the paragraph's reference to domestic violence and his family fearing him "created a propensity inference that [appellant] commits crimes against his family." (Appellant's Brief at 30.) Even assuming that to be true, we find appellant cannot demonstrate there is a reasonable probability the outcome of the trial would have been different if these two statements had been excluded from the report. The state presented ample evidence of guilt, including numerous inculpatory statements made by appellant on the six recordings, R.S.'s direct testimony of appellant's sexual conduct with her, and R.S.'s ability to provide a description of appellant's penis that was consistent with A.C.'s description. Trial counsel's failure to seek suppression of two sentences typed in a small font size and buried in a paragraph on a page in the middle of the 53-page exhibit does not amount to the prejudice required by *Strickland*.

{¶ 177} We find that all other statements in this paragraph were made for purposes of—and are reasonably pertinent to—R.S.'s mental health medical treatment and diagnosis. Thus, they fall within Evid.R. 803(4)'s hearsay exception. Based on the forgoing, we find appellant fails to demonstrate that an objection to Dr. Brink's summary of the allegations R.S. made against him would have been successful. Failure to object to admissible evidence does not constitute deficient performance of counsel under *Strickland*. *See Tyler*, 2006-Ohio-6896 at ¶ 40; *Taylor*, 78 Ohio St.3d at 31. Moreover, for the same reasons described above, he cannot demonstrate that the failure to suppress these statements prejudiced him.

{¶ 178} Based on the foregoing, we conclude that defense counsel's failure to seek exclusion of this paragraph in the Nationwide CAC report did not constitute ineffective assistance.

{¶ 179} *Second*, appellant takes issue with a sentence in the "Interview Summary" section authored by Ms. Daniels[4] stating: "The child's disclosure at the Child Assessment Center was clear, coherent, and consistent." (Appellant's Brief at 30, citing Trial Ex. B at 8.) Of note, Ms. Daniels was not asked about this statement in the report during her trial testimony. Appellant argues his trial counsel was ineffective in failing to seek excision of this statement from the Nationwide CAC report because it improperly reflected Ms. Daniels's opinion about the veracity of R.S.'s statements. (Appellant's Brief at 30.)

{¶ 180} The Supreme Court has held that an expert witness may not testify as to their opinion of the veracity of a child declarant. *Boston* at 128-29. More generally, an expert may not provide opinion testimony regarding the truth of a witness's statements or testimony. *State v. Stowers*, 81 Ohio St.3d 260, 262 (1998). Such testimony is presumptively prejudicial and inadmissible because it " 'infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility.' " *Boston* at 128-29, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988) (Brown, J., concurring). However, an expert may provide testimony that supports "the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis deleted.) *Stowers* at 262-63. This testimony " 'does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination.' " *Id.* at 263, quoting *State v. Gersin*, 76 Ohio St.3d 491, 494 (1996). *See also State v. Sayles*, 8th Dist. No. 108524, 2020-Ohio-5508, ¶ 37-40.

{¶ 181} Here, we conclude Ms. Daniels's statement in the Nationwide CAC report that R.S.'s account was "clear, coherent, and consistent" does not amount to an opinion on the veracity of R.S.'s allegations. Rather, Ms. Daniels's impression that R.S. gave a "clear, coherent, and consistent" statement is admissible information that can help the jury make an educated determination about the manner in which R.S. recounted her story and did not improperly vouch for R.S.'s credibility. Accordingly, because the testimony was permissible under *Boston* and *Stowers*, we find trial counsel was not ineffective for failing to object to this statement in the Nationwide CAC report.

---

[4] In his brief, appellant attributes this statement to Dr. Brink. However, this statement was made by Alicia Daniels, the licensed social worker who conducted the forensic interview of R.S.

{¶ 182} Even if counsel were deficient in failing to object to this statement in Ms. Daniels's report—which she was not asked about at trial—appellant has not demonstrated how he was prejudiced by the deficient performance such that the result of the trial could have been different. R.S. testified about the sexual encounters at trial. The state also presented evidence and testimony relating to the statements R.S. made about the sexual abuse in 2018 when she reported it. Thus, the jury was able to make its own determination during the trial as to whether R.S.'s statements were clear, coherent, and consistent for purposes of assessing her credibility. Accordingly, we find that appellant was not deprived of effective assistance of counsel when his counsel failed to object to the admission of the full Nationwide CAC report on the basis of this statement.

### d. Cumulative Error

{¶ 183} Finally, appellant argues his counsel was ineffective based on the cumulative effect of his errors during the trial. "Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 169. *See also State v. C.D.S.*, 10th Dist. No. 20AP-355, 2021-Ohio-4492, ¶ 112. As applied to a claim for ineffective assistance of counsel, "[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Graham* at ¶ 170, citing *State v. Hill*, 75 Ohio St.3d 195 (1996).

{¶ 184} We have already concluded that appellant has failed to demonstrate his trial counsel committed multiple errors under the performance prong of *Strickland*. Thus, in the absence of establishing that multiple errors were committed by his counsel at trial, he cannot establish cumulative error. Appellant has not, with these arguments, carried the burden of establishing an ineffective assistance of counsel claim on appeal. *See State v. Gear*, 3d Dist. No. 15-22-03, 2023-Ohio-1246, ¶ 59. Because all of his individual claims of ineffective assistance of counsel, with the exception of one (sentence in the report concerning the family's fear of appellant), are without merit as to deficient performance, we find he has failed to show cumulative error sufficient to reverse his convictions.

{¶ 185} Even assuming we found appellant's ineffective assistance allegations, when considered in the aggregate, amount to deficient performance of his trial counsel, we nonetheless find he cannot demonstrate the prejudice necessary under *Strickland*. This is because the state produced ample evidence of his guilt at trial. R.S. testified about the sexual encounters she had with him and described appellant's penis in a manner consistent with A.C.'s description of it. In the six recorded conversations between appellant and A.C., appellant never expressly denied having any sexual encounters with R.S. Instead, the jury heard appellant admit to engaging in some sexual conduct with R.S. (namely, mutual oral sex), describe where the first encounter occurred (living room of their Chatterly residence) and where others took place (the marital bed, for instance). The jury also heard him justify (e.g., he was fighting with A.C. and R.S. was not innocent) and apologize for his actions. Even if none of the performance errors appellant alleges occurred, we do not believe, in light of this inculpatory evidence, it is reasonably probable the outcome of his trial would have been different.

{¶ 186} Based on the foregoing, we find that appellant is unable to demonstrate ineffective assistance of counsel. Accordingly, we overrule his third assignment of error.

## IV. CONCLUSION

{¶ 187} Having overruled appellant's seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____